2017 IL App (3d) 140926

Opinion filed April 20, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| NANCY YANELLO, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-14-0926 |
| | ) | Circuit No. 11-L-756 |
| PARK FAMILY DENTAL and | ) | |
| JAE S. ROH, Individually and | ) | Honorable |
| As Agent and Servant of PARK | ) | Barbara Petrungaro, |
| FAMILY DENTAL, | ) | Judge, Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion. Justices Carter and Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1    The plaintiff, Nancy Yanello (Yanello), sued the defendants, Dr. Jae S. Roh and Park Family Dental, for professional negligence after certain dental implants surgically placed by Dr. Roh failed. Following a jury trial, judgment was entered in favor of the defendants on all counts. Yanello appeals the trial court's judgment and requests a new trial. Yanello contends that the trial court abused its discretion and committed reversible error by: (1) allowing a defense expert to present an actual human skull and a model skull to the jury and to use these skulls as real

evidence (rather than demonstrative evidence) to establish that Dr. Roh did not violate the standard of care, where the skulls were not disclosed to the plaintiff prior to trial pursuant to Illinois Supreme Court rule 213(f)  (Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007)) and the defendant did not lay a proper foundation for their admission; (2) allowing a defense expert to testify that a "synergy" of health conditions, including rheumatoid arthritis and osteopenia in the maxilla, caused or contributed to Yanello's bone loss and dental implant failure where there was no competent evidence that the claimant had either of those conditions and where the defense expert's causation theory was purely speculative; (3) allowing the defense to cross-examine Dr. Richard Burton, one of Yanello's expert witnesses, with the American Association of Oral and Maxillofacial Surgeons' (Association) Code of Professional Conduct in order to improperly suggest that Dr. Burton violated the Association's ethical rules by testifying.  In addition, Yanello maintains that the trial court abused its discretion by denying Yanello's motion to impose sanctions against the defendants' counsel under Illinois Supreme Court Rule 219(c) (Ill. S. Ct. R. 219 (c) (eff. July 1, 2002)) for repeatedly raising baseless objections during the evidence deposition of Dr. Robert Schneider, Yanello's treating prosthodontist.

¶ 2                                               FACTS

¶ 3        In 2009 and 2010, Dr. Roh extracted eight teeth from Yanello's maxilla (*i.e.*, her upper jaw), inserted four dental implants in her maxilla, and gave her a maxillary denture which snapped onto the dental implants.  Dr. Roh did not see any significant bone loss in the defendant's maxilla at the time.

¶ 4        On March 16, 2011, Yanello returned to Dr. Roh complaining that two of the implants were loose and painful.  Upon examination, Dr. Roh determined that three of the implants he placed had failed.  He also noted significant bone loss everywhere in Yanello's maxilla.  He

2

testified that the bone loss in Yanello's maxilla was a "significant finding" that could increase the risk that future dental implants could fail.

¶ 5    When Yanello returned to Dr. Roh on April 20, 2011, Dr. Roh removed the failed implants he had previously inserted and placed four new implants. At that time, Dr. Roh observed that there was barely enough depth in the bone to place dental implants in Yanello's maxilla.

¶ 6    On June 16, 2011, Yanello returned to Dr. Roh complaining of pain shooting up the side of her nose. Dr. Roh told Yanello that everything "seemed okay" with her implants at that time. Yanello continued to experience pain thereafter.

¶ 7    Two weeks later, Yanello went to the University of Iowa, where dental specialists had designed and placed implants in her lower jaw in 2005. She first saw Dr. Robert Schneider, a dental specialist and board certified prosthodontist. Schneider testified that Yanello had "chronic pain" and pain in her midline up her nose and lip. He referred Yanello to Dr. Richard Burton, a board certified oral surgeon and the vice chairman of oral surgery at the University of Iowa, for treatment of what Dr. Schneider characterized as "failed implants." Dr. Schneider testified that this treatment was "complex" because there were multiple implant failures, the angulation of the implants that were in place was poor, and Yanello had "lost a lot of alveolar bone."

¶ 8    Yanello saw Dr. Burton on August 29, 2011. Dr. Burton recommended that the implants placed by Dr. Roh be removed. On November 18, 2011, resident Dr. Brian Ludwig, acting under Dr. Burton's supervision, surgically removed all of the implants placed by Dr. Roh.

¶ 9    Thereafter, Yanello continued to experience pain in her maxilla. Her treaters at the University of Iowa determined that the pain was the result of permanent damage to the nasopalatine nerve caused by one of the implants that had been improperly placed by Dr. Roh.

3

In addition, the maxillary denture that Dr. Roh had fabricated for Yanello left her with functional deficits.

¶ 10     At trial, Yanello relied on the expert testimony of Drs. Ludwig, Schneider, and Burton and of her family doctor, Dr. Bhavesh Gandhi. Dr. Ludwig and Dr. Schneider each testified that Dr. Roh violated the standard of care in his placement of Yanello's dental implants. Specifically, Dr. Ludwig and Dr. Schneider each testified that the implants were improperly angled, which resulted in bone loss and implant failure. They further testified that one of the implants placed by Dr. Roh had impinged on Yanello's nasopalatine nerve and another had perforated Yanello's maxillary sinus.

¶ 11     Dr. Burton testified that he is a professor and vice chairman of oral and maxillofacial surgery at the University of Iowa Hospitals and Clinics and senior director of the American Board of Oral and Maxillofacial Surgery. He is licensed to practice dentistry in Illinois and is board certified in oral and maxillofacial surgery. He placed implants in Yanello's mandible in 2005. Dr. Burton testified that, after examining Yanello in August of 2011, he concluded that she had multiple failing maxillary implants that needed to be removed. He stated that the midline implant (located at a location below Yanello's nose) was placed within the contents of the incisive canal and was compressing the incisive or nasopalatine nerve, which provides sensation to the upper and lower jaw and teeth. Dr. Burton opined that Dr. Roh violated the standard of care when he: (1) placed the midline implant into the incisive canal; and (2) placed implants that were not properly angled and positioned. According to Dr. Burton, the improperly-placed implants led to the bone loss in Yanello's maxilla. Dr. Burton opined that, as a result of Dr. Roh's negligence, Yanello has no remaining alveolar bone, she has neurogenic pain, and she

4

is unable to function properly with her current denture. Dr. Burton also opined that Dr. Roh was not qualified to do the complex procedures that he performed on Yanello.

¶ 12    During cross-examination, defense counsel confronted Dr. Burton with the American Association of Oral and Maxillofacial Surgeons' Code of Professional Conduct (Association's Code) in an attempt to suggest that Dr. Burton was acting unethically by testifying against Dr. Roh. Yanello's counsel objected that the defendants had not produced the Association's Code prior to trial as required by Illinois Supreme Court Rules 213 and 214. He also objected to the foundation and relevance of the document. The trial court overruled these objections and allowed defense counsel to cross-examine Dr. Burton with Part G of the Association's Code, which is titled "Fairness in dealing with colleagues." Defense counsel read subpart G.1.08 to the jury, which provided: "Oral and maxillofacial surgeons who wish to serve as expert witnesses must not do so in cases for which they also served as one of the patient's treating doctors." Dr. Burton agreed that he was one of Yanello's treating doctors. He attempted to state that the Code provision at issue did not apply because he was "not testifying against an oral and maxillofacial surgeon," but defense counsel cut off his answer. Dr. Burton agreed that subpart G.1.02 of the Association's Code provides that, when a patient seeks a second opinion on her own for a problem or condition not yet treated, "before initiating treatment, the oral and maxillofacial surgeon should inform any health care practitioner who previously rendered an opinion on the same condition or problem provided the patient does not object to doing so." Dr. Burton admitted that he never reached out to Dr. Roh regarding his treatment of Yanello. On redirect, Dr. Burton testified that the Code provision did not apply because Dr. Roh was not a "colleague" of his in the Association.

5

¶ 13    Dr. Gandhi, Yanello's geriatric specialist and family doctor, also testified on Yanello's behalf. Dr. Gandhi stated that he was board certified in family medicine and geriatrics. He focused his practice on treating osteoarthritis, osteoporosis, and on reconciling medications taken by geriatric patients. Dr. Gandhi testified that he treated Yanello's dental pain by prescribing narcotic pain medication. He opined that Yanello did not have osteoporosis or rheumatoid arthritis, and that she had never had rheumatoid arthritis since he began treating her in 2009. Dr. Gandhi testified that Yanello had osteopenia[1] in her forearm and lumbar spine. However, Dr. Gandhi stated that he has never seen or heard of osteopenia in the maxilla.

¶ 14    Dr. Nicholas Panomitros was the defendants' testifying expert at trial. Dr. Panomitros testified that he was a lawyer, a professor at Loyola Law School, and a general dentist who was qualified to do general check-ups, fillings, root canals, crowns, orthodontics, extractions, and implants. He had taught classes in oral anatomy, oral pathology, oral medicine, head and neck anatomy, radiology, and ethics. Dr. Panomitros opined that the implants placed by Dr. Roh complied with the standard of care because they were "placed in bone and *** will provide function." He also opined that improper angulation did not cause the implant failures because all implants, like natural teeth, are angulate. According to Dr. Panomitros, the angulation of natural teeth is dictated by the "availability of bone." Similarly, he opined that anterior dental implants (those placed below the nose) must be angled to follow the naturally angled dentition due to the "very, very, very thin" amount of bone available in the anterior maxilla. He opined that implants are appropriately placed if they are "integrated" with the natural teeth and you can "fit them with an abutment angled right for whatever purpose you are using them for." He further opined that

---

[1] "Osteopenia" is bone density that is lower than normal peak density but not low enough to be classified as osteoporosis.

6

the implants placed by Dr. Roh were appropriately angled because they were "placed in the bone."

¶ 15    While defense counsel displayed Yanello's cephalometric (side profile) x-ray, Dr. Panomitros opined that the implants placed by Dr. Roh "could not have been placed in a more perpendicular position." Defense counsel then asked Dr. Panomitros if he had brought something "with respect to the angulation of the teeth." At that point, Dr. Panomitros displayed an actual human skull and a model skull. He testified that he would use the skulls to establish the thin amount of bone in the anterior maxilla.

¶ 16    Yanello's counsel objected to the skulls on the grounds that: (1) the defense had provided no foundation that the skulls were a true and accurate representation of Yanello's anatomy; (2) the skulls were not disclosed prior to trial under Supreme Court Rule 213; (3) the skulls were irrelevant and misleading to the jury; and (4) the use of the skulls was more prejudicial than probative. During a sidebar, defense counsel initially responded that Dr. Panomitros would show that the angulation of the skull that he had presented to the jury was "nearly identical" to the angulation of Yanello's teeth. He also stated that the purpose of the skulls was to show what the angulation of normal teeth is from a side profile, such as a cephalometric x-ray.

¶ 17    The trial court overruled Yanello's objections and allowed the defense to use the skulls as demonstrative evidence. However, the trial court barred the defense from suggesting that the skull represented or resembled Yanello's teeth. The court ruled that, if a defense witness wanted to suggest that the skull is "like Miss Yanello," the witness would have to lay an additional foundation for that testimony. After acknowledging Yanello's standing objection to the skulls, the trial court told the defense counsel that he could "go as far as to say this is a human skull, it shows the angulation of teeth in the human skull."

7

¶ 18    Thereafter, Dr. Panomitros testified that the skull he brought to trial is "what the majority of people's skulls look like." Over Yanello's objection, he invited the jurors to palpate their own interior maxilla to prove that the layer of bone in that area was "paper thin." The defense then projected an April 20, 2011, x-ray of Yanello to the jury and Dr. Panomitros used the skulls to demonstrate how an x-ray taken from a certain angle could hypothetically make an implant "look like it is in the incisive canal when actually it's not." He also used the skulls to demonstrate that natural teeth are very close to the incisive foramen and may actually impinge on the nasopalatine canal. The defense then displayed Yanello's June 30, 2011, x-ray to the jury, and Dr. Panomitros opined that the x-ray did not demonstrate that any of the implants placed by Dr. Roh had perforated the maxillary sinus. He used one of the skulls to demonstrate how an x-ray could appear to show something perforating the sinus cavity when in fact it was not. He used this demonstration to explain his opinion that "an x-ray is not conclusive" as to whether such perforation had actually occurred.

¶ 19    Dr. Panomitros opined that the failure of the implants placed by Dr. Roh could have been caused by a "synergy" of health conditions, including rheumatoid arthritis and osteopenia in the maxilla. Yanello's counsel objected to the foundation and relevance of this opinion testimony. Dr. Panomitros claimed that, as a dental practitioner, he had knowledge of osteopenia because he took medical and dental histories from his patients. Dr. Panomitros stated that his training in osteopenia was based on his study of microanatomy, biochemistry, and "history of whatever it is that you need to know." The trial court overruled Yanello's objections.

¶ 20    Dr. Panomitros then testified that rheumatoid arthritis is a condition where the body is attacking the synovium of the bone, and so [the body is] basically attacking itself." After another objection from Yanello's counsel, the trial court concluded that Dr. Panomitros was not qualified

8

to diagnose rheumatoid arthritis.[2] However, the court allowed Dr. Panomitros to testify about Yanello having rheumatoid arthritis based upon: (1) Dr. Panomitros's review of Yanello's records from the Christie Clinic, which contained at least one reference to rheumatoid arthritis in an "assessment" of the claimant; and (2) Yanello's alleged statement to Dr. Roh that she had rheumatoid arthritis.

¶ 21    Yanello's counsel objected that the Christie Clinic records were not disclosed before trial pursuant to Supreme Court Rule 213.[3] Yanello also objected to the admission of the alleged statement that Yanello made to Dr. Roh about rheumatoid arthritis on the ground that it was more prejudicial than probative. The trial court overruled Yanello's objections. It allowed Dr. Panomitros to testify about the Christie Clinic records and Yanello's alleged statement to Dr. Roh to identify the basis for his opinion that Yanello had rheumatoid arthritis. However, the trial court barred Dr. Panomitros from offering the Christie Clinic records as substantive evidence that Yanello had rheumatoid arthritis. The trial court gave the jury a limiting instruction stating that the Christie Clinic records were not in evidence.

¶ 22    During closing argument, defense counsel argued that the angulation and placement of the implants by Dr. Roh was proper. Counsel told the jurors, "all you have to do is put your finger in your mouth and feel the angulation of the jaw," and he suggested that the skull Dr. Panomitros used "shows the curvature of the jaw." Immediately thereafter, counsel stated "[o]f course you have to put the implant where the bone is there."

_____

[2] During cross-examination, Dr. Panomitros admitted that he is not qualified to treat or diagnose that rheumatoid arthritis.

[3] Defense counsel responded that the Christie Clinic records were included in Yanello's October 16, 2013, supplemental response to the defendants' request for production and that, in their supplemental answers to Yanello's interrogatories, the defendants stated that Dr. Panomitros had reviewed Yanello's October 16, 2013, supplemental production responses and relied upon them as a basis for his opinions.

¶ 23    Defense counsel also argued during closing that Yanello's doctors at the University of Iowa had a motive to put the blame on Dr. Roh because Dr. Ludwig's and Dr. Burton's surgery on Yanello was a proximate cause of her current injuries. He told the jurors that they were to judge the credibility of every witness. Counsel then argued that Dr. Burton "was not even supposed to be here testifying" according to the Association's Code and that "he knew it when I presented him that document *** He didn't have enough room to backpedal out of this room, but if he did, he would have, because he knew he wasn't supposed to be there, when he knew it was against the rules."

¶ 24    The issues instruction read to the jury noted that Yanello alleged that Dr. Roh was negligent in one or more of the following respects: (1) he provided extensive treatment, including the placement of multiple dental implants, without making and documenting a proper diagnostic plan, diagnostic impressions, or a surgical guide for the placement of implants; (2) he improperly placed dental implants into Yanello's incisive canal and nasopalatine nerve; (3) he improperly placed and improperly aligned dental implants in Yanello's maxilla; and (4) he placed dental implants in a fashion that precluded the successful use of a denture.

¶ 25    The jury returned a verdict for the defense on all counts. The jury also answered two special interrogatories as follows: (1) "Q: Were Dr. Roh and Park Family Dental guilty of negligence that was a proximate cause of Nancy Yanello's damages? A: No"; (2) Was Nancy Yanello guilty of negligence that proximately contributed to cause her alleged injuries by failing to follow reasonable dental advice? A: Yes."

¶ 26    This appeal followed.

10

¶ 28       On appeal, Yanello argues that the trial court abused its discretion by allowing the defense to show the jury an actual human skull and a model skull and to use the skulls to establish that Dr. Roh did not violate the standard of care. Although the trial court allowed the defense to use the skulls as "demonstrative evidence," Yanello maintains that the defense improperly used the skulls as real evidence to undermine the plaintiff's evidence and to support Dr. Panomitros' opinions that Dr. Roh's placement of dental implants in Yanello's maxilla was proper and did not injure Yanello. Yanello contends that the defense failed to lay a proper foundation for the skulls and that their use at trial was both misleading to the jury and highly prejudicial. Further, Yanello contends that the defendants should have been barred from using the skulls at trial because they failed to disclose the skulls prior to trial, as required by Supreme Court Rule 213.

¶ 29       Physical objects that are admitted into evidence or used at trial fall into one of two categories, real evidence or demonstrative evidence. *Sharbono v. Hilborn*, 2014 IL App (3d) 1205971, ¶ 30; see Ill. R. Evid. 401 (eff. Jan. 1, 2011). A physical object that has a direct part in the incident at issue such that it has probative value in and of itself is considered to be real evidence. *Sharbono*, 2014 IL App (3d) 1205971, ¶ 30; Michael H. Graham, Graham's Handbook of Illinois Evidence § 401.2, at 159 (10th ed. 2010). On the other hand, a physical object that does not have a direct part in the incident at issue and is only being used to help explain or illustrate to the trier of fact the verbal testimony of a witness or other evidence is considered to be demonstrative evidence. *Id.* Demonstrative evidence has "no probative value in and of itself and is merely admitted or used as a visual aid to the trier of fact." *Id.*; *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341–42 (1991).

¶ 30    "The great value of demonstrative evidence lies in the human factor of understanding better what is seen than what is heard." *Sharbono*, 2014 IL App (3d) 1205971, ¶ 30 (internal quotation marks omitted). The use of demonstrative evidence, therefore, is looked upon favorably by the courts because it allows the trier of fact to have the best possible understanding of the matters before it. *Id.* ¶ 30. "However, the same human factor that makes demonstrative evidence valuable—that people learn and understand better what they see, rather than what they hear—also makes it possible for parties to abuse the use of demonstrative evidence by giving a dramatic effect or undue or misleading emphasis to some issue, at the expense of others." *Id.* Thus, in ruling upon the admissibility of demonstrative evidence, the trial court "must be ever watchful to prevent or eliminate that abuse." *Id.*

¶ 31    The primary considerations in determining whether demonstrative evidence is admissible or may be used at trial are relevancy and fairness. See Ill. R. Evid. 401, 402, 403 (eff. Jan. 1, 2011); *Sharbono*, 2014 IL App (3d) 1205971, ¶ 31. As for relevancy, for demonstrative evidence to be admissible, "it must actually be used to illustrate or explain the verbal testimony of a witness as to a matter that is relevant in the case in question." *Sharbono*, 2014 IL App (3d) 1205971, ¶ 31; Graham, supra § 401.3, at 160. With regard to fairness, even if the relevancy test has been satisfied, demonstrative evidence may still be excluded by the trial court if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Sharbono*, 2014 IL App (3d) 1205971, ¶ 31. Moreover, demonstrative evidence may not be used substantively to show the basis of a medical expert's opinion or to support his conclusions. *Sharbano*, 2014 IL App (3d) 120597, ¶ 33.

12

¶ 32        In addition to the above, before demonstrative evidence may be presented or admitted at trial, a proper foundation for the use of the evidence must be established. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283-84 (2003); *Cisarik*, 144 Ill. 2d at 342; *Sharbono*, 2014 IL App (3d) 1205971, ¶ 32. To lay a proper foundation for demonstrative evidence, "a person with knowledge of the object" must testify that the object is "an accurate portrayal of what it purports to show." *Preston ex rel. Preston v. Simmons*, 321 Ill. App. 3d 789, 802 (2001); see also *Sharbono*, 2014 IL App (3d) 1205971, ¶ 32. For example, if a party seeks to admit a model of a human skeleton as demonstrative evidence to illustrate or explain testimony about human anatomy, a person with knowledge of the model skeleton must testify as to the accuracy of the model's depiction of the anatomical fact or feature at issue. *Preston*, 321 Ill. App. 3d at 802.

¶ 33        A trial court's ruling on the admissibility of evidence, including demonstrative evidence, will not be reversed on appeal absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *Sharbono*, 2014 IL App (3d) 1205971 at ¶ 29. The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was "arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court." *Sharbono*, 2014 IL App (3d) 1205971, ¶ 29; see also *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *Leona W.*, 228 Ill. 2d at 460. If a trial court commits an abuse of discretion in the admission of evidence, a new trial should be ordered only if the trial court's ruling appears to have caused substantial prejudice affecting the outcome of the trial. *Sharbono*, 2014 IL App (3d) 1205971, ¶ 29; see also *Leona W.*, 228 Ill. 2d at 460.

¶ 34        In this case, Dr. Panomitros did not use the skulls merely as a visual aid to explain or to illustrate his testimony. For example, he did not use the skulls merely to show the jury what he meant when he used medical terms like "maxilla," "mandible," or "alveolar bone." Rather, Dr.

13

Panomitros used the skulls to undermine the plaintiff's theory of the case and to provide substantive support for his own expert opinions. For example, he used the skulls to show that Dr. Roh had placed the implants at appropriate angles, consistent with the angulation of natural teeth as shown by the skulls. More specifically, he used the skulls to establish that there was a "very thin" level of bone available for the placement of implants in the maxilla, and he argued that the angle of any such implants was dictated and limited by the amount of bone in the maxilla. In so doing, Dr. Panomitros implicitly suggested that the anatomy depicted in the skulls was identical or similar to Yanello's anatomy, and used that "fact" to support his opinion that Dr. Roh's placement of the implants at issue was not negligent. Defense counsel reinforced this impression during closing argument by arguing that Dr. Roh's placement of the implants was proper because the skull Dr. Panomitros used "show[ed] the curvature of the jaw," and that Dr. Roh had to "put the implant where the bone is there."

¶ 35        Dr. Panomitros also used the skulls to undermine Yanello's x-ray evidence. Yanello argued that x-rays taken in April and June of 2011 showed that the implants placed by Dr. Roh had perforated the maxillary sinus and entered the nasopalatine (incisive) canal, causing nerve impingement. Comparing the skulls to the x-rays, Dr. Panomitros used the skulls to show that x-rays taken at certain angles could create the false impression that the implants were in the sinus or nasapalatine canal when they actually were not. Thus undermined the credibility of the x-ray evidence and supported Dr. Panomitros's opinion that the implants were properly angled and complied with the standard of care.

¶ 36        In sum, Dr. Panomitros did not use the skulls merely to assist the jury in visualizing or understanding the meaning of certain medical terms used during his testimony. Rather, he used them to provide substantive support for his own expert opinions that Dr. Roh's placement of

14

dental implants complied with the standard of care and did not injury Yanello. Accordingly, Dr. Panomitros used the skulls as real evidence (*i.e.*, as objects that purportedly had probative value in themselves), not merely as demonstrative evidence. He should not have been allowed to use the skulls in this manner unless the defendants had previously (1) disclosed the skulls as a basis for Dr. Panomitros's medical opinions prior to trial, pursuant to Supreme Court Rule 213, and (2) laid a proper foundation for Dr. Panomitros's opinion that the skulls were accurate representations of Yanello's dental anatomy. See, *e.g.*, *Sharbono*, 2014 IL App (3d) 1205971, ¶ 35.

¶ 37 The defense did neither. The defendants did not disclose the skulls as a basis for Dr. Panomitros's medical opinions prior to trial. Nor did they lay a proper foundation for Dr. Panomitros's use of the skulls. Before relying upon the skulls at trial, Dr. Panomitros testified that the human skull fairly and accurately depicted the skull of a human being and the model skull was a "combination of what the majority of people's skulls look like." That would have constituted an adequate foundation if the skulls were used merely as demonstrative evidence, *i.e.*, if they were used merely to explain the meaning of medical terms or to illustrate the appearance or function of various body parts on an average person's anatomy. See, *e.g.*, *Preston v. Simmons*, 321 Ill. App. 3d 798, 802 (2001). However, as noted, Dr. Panomitros went beyond this by using the skulls as real evidence to support his opinions regarding *Yanello's* anatomy and Dr. Roh's compliance with the standard of care. Before using the skulls in this manner, Dr. Panomitros was required to lay a proper foundation establishing that the skulls were an accurate representation of Yanello's anatomy or that Yanello's bone structure and angle of dentition were substantially similar to the bone structure and dentition depicted in the skulls. Because the defense provided no such foundation and failed to disclose the skulls prior to trial, Dr.

15

Panomitros's use of the skulls as real evidence should have been barred, and the trial court abused its discretion by allowing it. *Sharbono*, 2014 IL App (3d) 1205971, ¶ 35.[4]

¶ 38    We find this case to be substantially analogous to *Sharbono*. In that case, the plaintiff sued her radiologist for medical negligence alleging that he had failed to diagnose her breast cancer in a timely fashion. During the trial, the defendant, testifying as an expert witness, showed the jury images and diagrams from a learned treatise which purported to depict cancerous and benign lesions and compared these images to the plaintiff's ultrasound images. The defendant presented the textbook images and the plaintiff's ultrasound images side by side in a PowerPoint presentation, with some of the claimant's images being labeled "benign" together with the textbook's examples of benign lesions. Under these circumstances, our appellate court held that the defendant's use of the textbook images went beyond demonstrative evidence and was used to "support, and show the basis for, defendant's medical opinion that [the plaintiff's] *** images were correctly interpreted as benign." *Sharbano*, 2014 IL App (3d) 1205971, ¶ 33. We found that this improper use of the textbook images was highly prejudicial to the plaintiff because it went to the heart of the plaintiff's malpractice claim and because the defendant failed to establish the textbook's reliability or to disclose it prior to trial, thereby depriving the plaintiff of an opportunity to conduct an effective cross-examination on these matters.

¶ 39    Similarly, in this case, Dr. Panomitros used the skulls to "support, and show the basis for" his opinions that Dr. Roh had properly placed the dental implants at issue, that Dr. Roh had complied with the standard of care, and that the implants placed by Dr. Roh did not enter

---

[4] The trial court barred the defense from suggesting that the skulls represented or resembled Yanello's teeth, ruling that if a defense witness wanted to suggest that the skull is "like Miss Yanello," the witness would have to lay an additional foundation for that testimony. However, when Dr. Panomitros proceeded to use the skulls as if they were a representation of Yanello's anatomy (in violation of the trial court's order), the trial court erroneously allowed him to do so despite Yanello's standing objection to the skulls.

16

Yanello's nasopalatine canal or maxillary sinus. Moreover, as in *Sharbano*, Dr. Panomitros's use of the skulls to show the basis of his expert opinion in this case was highly prejudicial because it "went to the heart of the malpractice claim" (*i.e.*, that Dr. Roh negligently placed the implants and injured Yanello) and because the skulls were not disclosed prior to trial as required by Rule 213. *Sharbono*, 2014 IL App (3d) 1205971, ¶ 36. The use of the skulls at issue was therefore reversible error. *Id.*

¶ 40 The defendants argue that Dr. Panomitros's use of the skulls was proper because: (1) Dr. Panomitros used the skulls after he had already testified that Dr. Roh's placement of implants was not negligent and that the x-rays could create a false impression of perforation into the sinus and nasopalatine canal, and after he had disclosed these opinions prior to trial; (2) one of Yanello's expert witnesses, Dr. Schneider, "invited error" on this issue by using a model of a maxilla and a dental implant to similar effect during his testimony; and (3) even if Dr. Panomitros's use of the skulls was improper, Yanello suffered no "substantial prejudice" thereby because her attorney had a full opportunity to cross-examine Dr. Panomitros (during which he could have undermined the basis for any comparison between the skulls and Yanello's anatomy), and because there was an abundance of other evidence suggesting that Dr. Roh did not act negligently.

¶ 41 We disagree. Dr. Panomitros's improper use of the skulls substantially prejudiced Yanello by misleading the jury to believe that the skulls accurately represented the bone density levels and structure of Yanello's maxilla. Thus, the skulls improperly served as powerful visual, substantive evidence that might well have persuaded the jurors to accept Dr. Panomitros's opinions that Dr. Roh acted within the standard of care. Moreover, the defendants' failure to disclose the skulls as a basis for Dr. Panomitros's opinions prior to trial hobbled Yanello's

17

counsel's ability to effectively cross-examine Dr. Panomitros on this issue, thereby compounding the prejudice. See *Sharbono*, 2014 IL App (3d) 1205971, ¶ 36 (ruling that "it is a matter of fundamental fairness that the adverse party be given proper and timely disclosure" of the basis for its opponent's expert's opinions "so that it may have the opportunity to prepare for cross-examination").

¶ 42    Further, contrary to the defendants' argument, Yanello did not "invite error" on this issue through Dr. Schneider's use of demonstrative evidence. Unlike Dr. Panomitros, Dr. Schneider merely used models to illustrate or explain his testimony; he did not link the models to Yanello's dentition or use them to support his opinion that Dr. Roh had violated the standard of care. Thus, Dr. Schneider, unlike Dr. Panomitros, properly used models as demonstrative evidence, rather than as real evidence. In any event, Dr. Schneider used a model maxilla and a model dental implant; he did not use the skulls used by Dr. Panomitros. Thus, any error committed by Dr. Schneider in the use of demonstrative evidence could not "invite error" as to Dr. Panomitros's use of the skulls, which were different objects.

¶ 43    Having determined that reversal of the trial court's judgment and remand for a new trial is warranted, we need only address the remaining issues raised by Yanello to the extent necessary to prevent any possible errors from re-occurring on retrial. See *Sharbono*, 2014 IL App (3d) 120597, ¶ 38. We will address each of these issues briefly in turn.

¶ 44    First, we agree with Yanello that the trial court erred when it permitted Dr. Panomitros to testify that rheumatoid arthritis and osteopenia caused or contributed to the bone loss in Yanello's maxilla and to the resulting failure of Yanello's dental implants. Expert opinion testimony is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field with "at least a modicum of reliability," and the testimony would assist the

18

jury in understanding the evidence. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 28 (2008), quoting *Turner v. Williams*, 326 Ill. App. 3d 541, 552 (2001). However, an expert's opinion is only as valid as the reasons for the opinion, and a party must lay a foundation sufficient to establish the reliability of the bases for the expert's opinion. *Petraski*, 382 Ill. App. 3d at 28; *Turner*, 326 Ill. App. 3d at 552–53; see also *Gross v. Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶ 24 (ruling that "[e]xpert opinions must be supported by facts and are only as valid as the facts underlying them"). If the basis of an expert's opinion is grounded in guess or surmise, it is too speculative to be reliable. *Gross*, 2011 IL App (4th) 100615WC, ¶ 24; *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 885 (1999). An expert should not be allowed to opine regarding the cause of an injury based on nonexistent facts. *Baird v. Adeli*, 214 Ill. App. 3d 47, 65 (1991); see also *Coffey v. Brodsky*, 165 Ill. App. 3d 14, 22-23 (1987) (holding that trial court should have stricken the expert testimony of a physician because it was speculative and unsupported by the evidence). Moreover, "[e]vidence of preexisting [medical] condition should be excluded where there is no evidence of a causal connection between the preexisting condition and the current injury." *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 976 (1998); see also *Voykin v. Estate of Gordon DeBoer*, 192 Ill. 2d 49, 59; *Johnson v. Bailey*, 2012 IL App (3d) 110016.

¶ 45    In this case, the trial court allowed Dr. Panomitros to testify that the failure of Yanello's dental implants was caused by a "synergism" of medical conditions, including rheumatoid arthritis and osteopenia. However, there was no evidence suggesting that Yanello had been diagnosed with rheumatoid arthritis at the time she was being treated by Dr. Roh. To the contrary, Yanello's treating physician, Dr. Gandhi, testified that Yanello did not have rheumatoid arthritis and was not being treated for that condition. Although Dr. Roh testified that Yanello

once told him that she had rheumatoid arthritis, there was no evidence that Yanello had ever been diagnosed with that condition or been treated for it. There were a handful of references to rheumatoid arthritis in the Christie Clinic records (a few references in Yanello's prior medical history and one "assessment" of rheumatoid arthritis), but no definitive diagnosis of that condition.[5] Similarly, while there was evidence that Yanello had osteopenia in her forearm, Dr. Gandhi testified that there was no evidence that Yanello ever had osteopenia in her *maxilla*. Nor were there any medical records, expert opinion testimony, or other evidence (aside from Dr. Panomitros's conclusory opinion) suggesting that rheumatoid arthritis or osteopenia could have caused bone loss in the defendant's maxilla. Accordingly, Dr. Panomitros failed to present a sufficient foundation establishing the reliability of his opinion that Yanello's purported rheumatoid arthritis and her osteopenia causally contributed to the failure of her dental implants. His opinion on these matters should therefore have been excluded, and the trial court abused its discretion by allowing it.[6]

---

[5] Although Dr. Panomitros relied upon the Christie Clinic records as a basis for his opinion that Yanello had rheumatoid arthritis, those records were not admitted as substantive evidence at trial. An expert witness may base his opinion on medical records (and may testify as to the content of such records) even if the records are not admitted into evidence, so long as the records are "of a type reasonably relied upon by experts in the particular filed in forming opinions or inferences upon the subject." *Piano v. Davidson*, 157 Ill. App. 3d 649, 670 (1987); see also IL. R. Evid. 703 (eff. Jan. 1, 2011); *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)). However, to be admissible, an expert opinion must be supported by a foundation sufficient to establish the reliability of the bases for the expert's opinion. *Petraski*, 382 Ill. App. 3d at 28. In this case, the Christie Clinic records did not provide an adequate foundation for Dr. Panimitros's diagnostic and causation opinions.

[6] We note that our holding in this case does not contradict or qualify our appellate court's holding in *Hemminger v. LeMay*, 2014 IL App (3d) 120392. In *Hemminger*, our appellate court reversed the trial court's granting of a directed verdict to the defendant doctor in a medical malpractice case on the issue of proximate causation. The plaintiff's expert testified that the defendant's failure to diagnose the plaintiff's cervical cancer when she first complained of abdominal pain and spotting caused the plaintiff's chances for survival to decrease from between 58–63 percent to 32 percent. *Id.* ¶ 19. Our appellate court held that this testimony was sufficient to create a jury question on the issue of proximate causation under a "lost chance of survival theory" even though the plaintiff's expert was a general gynecologist who did not treat cervical cancer. *Id.* ¶¶ 24-31. The defendants argue that *Hemminger* suggests that Dr. Panomitros's opinions on the causes of the claimant's implant failure were admissible because *Hemminger* "reaffirmed

¶ 46    The defendants argue that Yanello forfeited any objection to Dr. Panomitros's testimony on this issue because, although the trial court denied Yanello's motion *in limine* to exclude any references to her alleged rheumatoid arthritis or osteopenia, Yanello's counsel did not object again at trial when Dr. Panomitros gave the testimony in question. We disagree. Before Dr. Panomitros' testified, Yanello had already "fronted" the issues of Yanello's alleged rheumatoid arthritis and osteopenia during her case-in-chief in an attempt to blunt the impact of the trial court's prior adverse ruling. That was perfectly proper, and it did not result in a waiver or forfeiture of the objection on appeal. *People v. Spates*, 77 Ill. 2d 193 (1979). Moreover, it rendered any further trial objection on this issue both futile and unnecessary. In any event, the rule of forfeiture is a limitation on the parties, not the court. *Smith v. Monold Construction, Inc.*, 348 Ill. App. 3d 1051, 1056 (2004); see also *In re Charles H.*, 409 Ill. App.3d 1047, 1055 (2011). Accordingly, we decline to find the issue forfeited.

¶ 47    Yanello also argues that the defense's cross-examination of Dr. Burton with the Association's Code was improper, "highly prejudicial," and "grounds for a new trial." The latitude afforded in cross-examination is within the discretion of the circuit court, "reversible only for a clear abuse of discretion, resulting in manifest prejudice to a party." *Creighton v.*

the principle that the ability of an expert witness to give testimony regarding causation is not dependent on whether the expert is a specialist in any particular field." However, *Hemminger* is distinguishable from the instant case in several material respects and does not support the defendants' argument. First, because *Hemminger* involved the appeal of a directed verdict for the defendant, our appellate court was obliged to consider the evidence and to draw every reasonable inference in the light most favorable to the plaintiff. *Id.* ¶ 17. Second, *Hemminger* involved the standards for establishing causation under a "lost chance of survival theory," which are not at issue in this case. Third, and most importantly, *Hemminger* did not address whether an expert witness laid a proper foundation establishing the reliability of his her expert opinions. The defendants in *Hemminger* were precluded from challenging "the qualifications or the foundation for [the plaintiff's expert's] causation opinion" on appeal because they had not cross-appealed the trial court's decision to allow the plaintiff's expert to offer a causation opinion. *Id.* ¶ 30. Here, by contrast, Yanello has challenged the trial court's decision to allow Dr. Panomitros to offer a causation opinion, and we hold that the trial court erred in allowing Dr. Panomitros's opinion because it was not supported by a sufficient foundation.

*Thompson*, 266 Ill. App. 3d 61, 69 (1994); see also *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147, 156 (2010) (ruling that an erroneous evidentiary ruling warrants reversal only if the error "was substantially prejudicial and affected the outcome of the trial"); *Simmons v. Garces*, 198 Ill. 2d 541, 566–67 (2002). Here, Yanello cannot demonstrate that she suffered "manifest prejudice" from the cross-examination sufficient to warrant reversal. Dr. Burton was allowed to present his reading of the Code provisions and to explain to the jury why he did not believe the cited provisions applied. Accordingly, the cross-examination at issue did not thoroughly discredit Dr. Burton or his medical opinions in the eyes of the jury. In addition, even assuming *arguendo* that the cross-examination damaged Dr. Burton's credibility to some extent, it was unlikely to affect the outcome of the trial because Dr. Burton was not the only expert who opined that Dr. Roh had violated the applicable standard of care and caused the failure of Yanello's implants. Drs. Ludwig and Schneider also testified on these subjects and presented opinions nearly identical to Dr. Burton's opinions.[7] Moreover, contrary to Yanello's suggestion, the defendants were not required to produce the Association's Code prior to trial pursuant to Supreme Court Rules 213, 214, or 237 because they used the Code provisions during cross-examination for impeachment purposes only, not as substantive evidence. *Stapleton*, 403 Ill. App. 3d at 156; *Southern Illinois Airport Authority v. Smith*, 267 Ill. App. 3d 201 (1994).

¶ 48 Nevertheless, the cross-examination at issue was improper and should not have been allowed. Through its Code of Professional Conduct, the Association attempts to bar its member surgeons from offering expert opinions in cases for which they also serve as one of the patient's

---

[7] This distinguishes Yanello's case from *Poole v. The University of Chicago*, 186 Ill. App. 3d 560 (1989), a case upon which Yanello relies. See *Brown v. Moawad*, 211 Ill. App. 3d 516, 529 (1991).

22

treating doctors. Only the Illinois legislature and the Illinois courts may determine the admissibility and proper scope of expert testimony in medical malpractice actions. Private accrediting bodies of doctors like the Association may not attempt to thwart their members from testifying as expert witnesses against their colleagues (or against any other health care practitioners) by declaring such testimony to be a violation of professional ethics. Any qualified expert may present expert opinion testimony that a doctor or other healthcare practitioner violated the applicable standard of care, notwithstanding any purported professional "ethical rule" to the contrary. Thus, the cross-examination at issue was both irrelevant and in violation of public policy, and the trial court abused its discretion in allowing it. The trial court should bar any such cross-examination based on the Association's Code during retrial.

¶ 49     Finally, Yanello argues that the trial court abused its discretion by failing to sanction the defendants' counsel under Illinois Supreme Court Rule 219(c) (Ill. S. Ct. R. 219(c) (eff. July 1, 2002)) for repeatedly raising baseless objections during the evidence deposition of Dr. Schneider, Yanello's treating prosthodontist. Whether to award sanctions under Rule 219(c) is a matter within the trial court's discretion, and the court's determination will not be disturbed absent an abuse of discretion. *Adcock v. Brakegate, Ltd.*, 247 Ill. App. 3d 824, 843 (1993). To award monetary sanctions under the rule, there must be a discovery abuse (*i.e.*, a violation of a statutory discovery rule) that justifies the imposition of such sanctions. For example, in *Golembiewski v. Hallberg Insurance Agency*, 262 Ill. App. 3d 1082 (1994), the case upon which Yanello principally relies, defense counsel repeatedly instructed his client (the deponent) not to answer questions, necessitating the termination of the deposition. He then told defense counsel to "get the hell out of my office." Here, defense counsel did not engage in such an obvious violation of a statutory discovery rule. He merely raised several objections during an evidence

23

deposition that were later overruled by the trial court. Although some of those objections appear to have been unwarranted, it is not clear that counsel's conduct amounted to a cognizable discovery violation that would justify the award of monetary sanctions under any discovery statute or rule. Thus, the trial court did not abuse its discretion by refusing refusal to award sanctions against defense counsel.

¶ 50                                                    CONCLUSION

¶ 51        The judgment of the circuit court of Will County is reversed, and the matter is remanded for a new trial.

¶ 52        Reversed; cause remanded.