2020 IL App (1st) 181887

FIRST DISTRICT
SIXTH DIVISION
August 28, 2020

No. 1-18-1887

|  |  |  |
|---|---|---|
| JESSE PEREZ, as Independent Executor of the Estate of<br>Marilyn Medina Perez, Deceased, | ) ) ) | Appeal from the<br>Circuit Court of<br>Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ST. ALEXIUS MEDICAL CENTER, an Illinois Corporation;<br>JEFFREY E. CHUNG, M.D.; MIDSUBURBAN<br>RADIOLOGICAL CONSULTATNTS OF WOODSTOCK, LTD;<br>CHRISTOPHER MICHAEL, M.D.; BRAD L. EPSTEIN, M.D.;<br>SUBURBAN WOMEN'S HEALTH SPECIALIST, LTD.;<br>DONALD R. TAYLOR, D.O.; SUBURBAN MATERNAL<br>FETAL MEDICINE, LLC; VISHVANATH C. KARANDE,<br>M.D.; and KARANDE AND ASSOCIATES, S.C., | ) ) ) ) ) ) ) ) ) ) | No. 14 L 10905 |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (St. Alexius Medical Center and Jeffrey E. Chung, M.D.,<br>Defendants-Appellees). | ) ) | Edward S. Harmening<br>Judge, Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva concurred in the judgment and opinion.
Justice Connors dissented, with opinion.

## OPINION

¶ 1    Plaintiff, Jesse Perez (Jesse) as independent executor of the Estate of Marilyn Medina

Perez, deceased, appeals a judgment following a jury trial for defendants St. Alexius Medical

Center (St. Alexius) and Jeffrey Chung, M.D. Plaintiff also appeals trial court orders striking his

petition for adjudication of criminal contempt against Chung and denying his motion to amend his

posttrial motion to incorporate a perjury allegation from his contempt petition.

¶ 2 On appeal, plaintiff contends that (1) the jury's finding that Chung was not the apparent agent of St. Alexius was against the manifest weight of the evidence and the court erred by refusing to give jury instructions submitted by plaintiff related to apparent agency; (2) the court erred by barring plaintiff from using Chung's Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) disclosure against defendants as an evidentiary admission and as impeachment; (3) the court erred by allowing defendants' expert to use certain images during his testimony even though defendants did not disclose them until the morning of the expert's testimony; (4) the court erred by barring plaintiff from cross-examining Chung with the American College of Radiology (ACR) practice guideline; (5) the cumulative effects of these errors denied plaintiff a fair trial and warrants a new trial; and (6) the court erred by dismissing plaintiff's petition for adjudication of criminal contempt against Chung and by denying plaintiff's posttrial motion to include the allegations of perjury in the petition. Defendants contend that the two-issue rule precludes plaintiff from establishing reversible error. For the reasons stated below, we vacate the judgment and remand for a new trial.

¶ 3                                    I. JURISDICTION

¶ 4 In 2014, plaintiff brought this civil action against various defendants including Chung, St. Alexius, Dr. Christopher Michael, M.D., and Suburban Women's Health Specialists, Ltd. (Suburban). At trial, the jury considered claims against only Chung, Michael, St. Alexius, and Suburban. On May 21, 2018, the jury issued verdicts in favor of Chung and St. Alexius against plaintiff and in favor of plaintiff against Michael and Suburban. The court entered judgment on the verdicts for Chung and St. Alexius that day and entered judgment regarding Michael and Suburban on May 29, 2018. Plaintiff filed his posttrial motion on June 18, 2018, and later filed his petition to adjudicate Chung in criminal contempt and motion to amend his posttrial motion. The court struck the contempt petition and then denied the posttrial motion and the motion to amend

on August 28, 2018. Plaintiff filed his notice of appeal on August 31, 2018. Accordingly, we have jurisdiction here pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 5                                    II. BACKGROUND

¶ 6     This is a wrongful death and survival action raising medical malpractice claims regarding Marilyn Perez (Marilyn), who died from metastatic pelvic abdominal cancer about seven months after she gave birth to twins by caesarean section. The cancer, discovered during the June 2013 cesarean section, originated from a teratoma on her left ovary that ruptured in May 2013. Plaintiff brought suit against various defendants including physicians who treated Marilyn before and during her pregnancy. The case went to a jury trial against Michael, an obstetrician-gynecologist involved in her treatment; Suburban, Michael's medical practice; Chung, the radiologist who interpreted Marilyn's ultrasound when she came into St. Alexius's emergency room on August 11, 2012; and St. Alexius under an apparent agency theory. The jury returned verdicts in favor of plaintiff against Michael and Suburban for $25 million. It returned verdicts for Chung and St. Alexius, finding that Chung was not an apparent agent of St. Alexius. Shortly after trial, the court dismissed Michael and Suburban from the case with prejudice based on a $1 million settlement. This appeal thus concerns only the verdicts and the rulings regarding Chung and St. Alexius.

¶ 7                                    A. Teratoma

¶ 8     Various experts testified about teratomas, which arise in ovaries and can contain such matter as fat, teeth, hair, or eyeballs. When a teratoma increases in size, it can cause the ovary to twist and thus compromise the ovary's blood supply. The risk of a teratoma rupturing, spilling its contents into the pelvis and abdomen, also increases as the mass gets larger. A mature teratoma is generally benign but with a 0.2 to 2% chance of transforming into a malignant teratoma.

¶ 9    A computed tomography (CT) scan is considered one of the best radiological methods to diagnose a teratoma and is superior to an ultrasound for that purpose. A CT scan has much better sensitivity and provides a better picture and more detail than an ultrasound. Air or matter in a person's bowel can obscure sound waves and make it difficult to identify structures and visualize a teratoma on an ultrasound.

¶ 10                              B. Overview of Timeline

¶ 11    Michael, Marilyn's primary obstetrician-gynecologist, referred her in September 2011 to Dr. Vishvanath Karande, an obstetrician-gynecologist and fertility specialist, for fertility treatment and *in vitro* fertilization.

¶ 12    On August 11, 2012, Marilyn went to the St. Alexius emergency room with pelvic pain, and emergency room physician Dr. Al Sarraj ordered a CT scan and ultrasound. Dr. Gregory Gullo read the CT scan and reported a teratoma on Marilyn's left ovary. Chung interpreted the ultrasound and reported that Marilyn's ovaries were "unremarkable" and there was "[n]o adnexal mass seen." Chung did not refer to the CT report or a teratoma in his report.

¶ 13    Michael saw Marilyn five days after her emergency room visit and reviewed the CT report, which identified the teratoma, and the ultrasound report, which did not refer to a teratoma. Michael concluded that Marilyn did not have a teratoma. Marilyn proceeded with *in vitro* fertilization treatments and became pregnant with twins after Karande implanted embryos in December 2012.

¶ 14    On March 8, 2013, Marilyn went to St. Alexius for abdominal pain and had an appendectomy after showing symptoms consistent with appendicitis. On March 13, 2013, she was admitted to St. Alexius for the same abdominal pain. A CT scan of Marilyn's pelvis taken that day showed she had a teratoma. Additional pregnancy ultrasounds, looking at the same area as a pelvic

ultrasound, were taken in March 2013 and the physicians interpreting these ultrasounds did not identify the teratoma on the ultrasounds.

¶ 15    On May 3, 2013, Marilyn was admitted to St. Alexius for acute onset abdominal pain. Plaintiff's expert Dr. Marcela Guadalupe DelCarmen testified that the teratoma had ruptured at that time, causing the contents of the teratoma to leak. That leakage in turn caused Marilyn "stabbing abdominal pain" and tenderness and caused metastatic cancer to spread. During Marilyn's caesarian section on June 21, 2013, the ruptured teratoma was removed. On January 15, 2014, Marilyn died as a result of metastatic cancer from the teratoma.

¶ 16                              C. Emergency Room Consent Form

¶ 17    On August 11, 2012, Marilyn's husband, Jesse, took her to the St. Alexius emergency room because she had severe pelvic pain. They chose St. Alexius as it was near their home, had a "very good reputation," and "was like a one-stop shop, *** any service you need was available there." They had gone to St. Alexius's emergency room about a year earlier due to the flu.

¶ 18    Jesse testified about the circumstances around Marilyn's execution of the consent form during the visit. As Marilyn was in the examination room, a woman came in and told Marilyn that she had "to sign here, here, here." The woman did not explain the form and was in the room for "[n]ot even a minute." Jesse acknowledged that Marilyn's signature was on the form, a one-page document entitled "Consent for Medical Treatment." The second section on the form contained an "Authorization to Release Information" section, which stated in the second paragraph:

> "*INDEPENDENT STATUS OF PHYSICIANS*: I recognize that any or all physicians, residents, or medical students (under the supervision of physicians and/or residents), who furnish services to me during this admission are INDEPENDENT

CONTRACTORS and are NOT AGENTS OR EMPLOYEES OF THE HOSPITAL."

(Emphasis in original.)

Jesse acknowledged that Marilyn had a PhD and was detail-oriented. He could not recall whether Marilyn expressed any confusion about signing the form. Neither Marilyn nor Jesse met Chung, had heard of him before that day, or had chosen him to read Marilyn's ultrasound.

¶ 19                    D. CT and Ultrasound Reports of August 11, 2012

¶ 20    Emergency room physician Sarraj ordered a CT scan of Marilyn's abdomen and pelvis. Gullo, a general diagnostic radiologist at St. Alexius, reviewed the CT scan and signed his report at 2:29 p.m. He reported that the CT scan showed that Marilyn had multiple fibroids and a teratoma above the uterus about the size of a softball, 7 by 6.3 centimeters.

¶ 21    Sarraj ordered an ultrasound of Marilyn's pelvis due to her pelvic pain. Plaintiff's expert DelCarmen testified that Sarraj's deposition testimony showed he ordered the ultrasound "not to confirm the teratoma" but "to determine whether there was appropriate blood flow" to the ovaries to check they were not twisted, which would require emergency surgery. Plaintiff's expert Dr. Richard Gore also testified that Sarraj ordered the ultrasound to examine blood flow to the ovary.

¶ 22    Chung interpreted the ultrasound images and signed his report at 4:56 p.m. Chung reported that Marilyn had five fibroids, the left ovary was "unremarkable," there was "[n]o adnexal mass seen," and the ultrasound confirmed that there was adequate blood flow to both ovaries. Chung's report stated "Comparison: None," meaning that he did not conduct any comparison examinations.

¶ 23    Sarraj told Jesse and Marilyn that Marilyn had a teratoma that should be removed. He initially wanted to admit her to the hospital but ultimately discharged her with instructions to follow up with Michael.

¶ 24                                    E. Karande's Testimony

¶ 25    Marilyn began seeing Karande in October 2011 for fertility treatments and was implanted with embryos in December 2012. Under Karande's care, Marilyn's ovaries were always normal, including at the time of implantation. Karande never had a reason to think that Marilyn had a teratoma. Had Karande known she had a teratoma larger than two centimeters, he would not have proceeded with *in vitro* fertilization but would have sent her to Michael for further evaluation.

¶ 26                                    F. Michael's Testimony

¶ 27    Michael was Marilyn's obstetrician and saw her on August 16, 2012, five days after her emergency room visit. Michael had the August 11 CT report that showed a fat density pattern consistent with a teratoma and the August 11 ultrasound report that indicated Marilyn's ovaries were normal. Michael concluded that Marilyn's ovaries were normal because the ultrasound report indicated "normal ovaries." Based on Chung's ultrasound report, Michael concluded that Marilyn did not have a teratoma, as teratomas come from ovaries and she could not have a normal ovary with a teratoma. Relying on Chung's report, Michael told Marilyn that she did not need surgery to remove a teratoma and could continue with *in vitro* fertilization.

¶ 28    Michael did not think there was a discrepancy between the CT and ultrasound reports because the calcium and fat pattern description of a teratoma, as indicated in the CT report, could also be consistent with fibroids. Michael did not communicate with Chung or Gullo. In August 2012, Michael knew that a CT test was a more definitive test than an ultrasound to diagnose a teratoma. If a patient had a seven-centimeter teratoma and wanted to get pregnant, the standard of care required Michael to recommend removing the teratoma.

¶ 29                                    G. Chung's Testimony

¶ 30    Chung testified that he was a board-certified diagnostic radiologist who was a partner at, and employed by, Midsuburban Radiological Associates, LLC. He was not an employee of St. Alexius. St. Alexius gave him privileges to work in its radiology department—he was on the medical staff and permitted to practice his specialty there—and St. Alexius could revoke his privileges. Chung testified that St. Alexius did not hire him, could not fire him, and did not control his practice. He had to adhere to a work rotation rather than working when he pleased. He was required to use his own medical judgment. St. Alexius supplied Chung's workspace; all equipment including computers, furniture, and radiology equipment; and the scans he interpreted.

¶ 31    On August 11, 2012, St. Alexius assigned Chung to review Marilyn's pelvic ultrasound. He never met Marilyn or Jesse, and his ultrasound interpretation was his only involvement with Marilyn. He reviewed about 100 different studies on that day and had no independent memory of Marilyn's case, so he testified based on his general memory of his custom and practice.

¶ 32    Sarraj ordered the ultrasound for Marilyn because she had pelvic pain. Chung looked at Marilyn's ultrasound images to determine whether there was consistent blood flow to both ovaries. Chung's ultrasound report indicated "left ovary unremarkable" and that Marilyn had five fibroids. He indicated "Comparison: None," meaning that he did not look at a comparison examination. Chung could not remember whether he looked at that day's CT scan when he interpreted Marilyn's ultrasound. If he had reviewed the CT report, he would have documented it in his ultrasound report. He did not see any signs of a teratoma on Marilyn's August 11 ultrasound.

¶ 33    Chung knew that other physicians treating Marilyn would rely on his report. On the day of trial, he still did not think his report was wrong. He did not see an ovarian mass, and there was clear evidence that Marilyn had multiple fibroids. He testified that the standard of care for a

radiologist was to compare relevant exams, in this case, other pelvic ultrasounds. If he "had any questions or needed more information or both, then I think the standard would require me to look beyond that into other modalities or other examinations as well." He did not have any questions with Marilyn's ultrasound report that would have caused him to look to a CT scan for comparison.

¶ 34    Chung also testified that if he had been aware of the CT scan, it would have been his custom and practice to review it as part of his ultrasound interpretation. Plaintiff's counsel played a video of Chung's deposition testimony with the following colloquy:

> "Q. So when you were looking at these images of this ultrasound, were you doing so with the teratoma in mind that you knew was identified on the CT from two hours earlier?
>
> A. Well, to answer the question, yes, but that's not the only thing I'd be concerned about or looking at or trying to evaluate."

¶ 35    St. Alexius had a computerized record system that allowed Chung to access the CT and ultrasound images. When Chung reviewed an ultrasound in the system, previous ultrasound examinations automatically populated. While other comparison studies such as a CT scan did not automatically populate, he could search the system to find them. However, Chung had no reason to search the system for other comparison studies. He had the technologist's worksheet when he reviewed the ultrasound, using it to obtain Marilyn's clinical history and the reason for the examination, but it did not show that a CT scan had been performed that day.

¶ 36    At trial, Chung identified an "order form" or "requisition form" that the technologist received from the emergency room physician. The form showed previous examinations performed on Marilyn, including the August 11 CT scan. However, Chung did not look at this document or use it when he interpreted the images. Based on his background and experience, it was his opinion

that his interpretation of the August 11, 2012, ultrasound complied with the standard of care. The ultrasound interpretation and report did not negate the findings of the CT scan.

¶ 37                                    H. Expert Testimony

¶ 38                                    1. Gore

¶ 39    Gore, a diagnostic radiologist and medical school professor, testified as an expert for plaintiff regarding the standard of care for Chung's ultrasound interpretation of August 11, 2012. The CT report and images from that day showed that Marilyn had a 7 by 6.3 centimeter sized teratoma. Gore identified the teratoma in the August 11 ultrasound without having the CT report and did not see a normal left ovary in the ultrasound images. He also testified that he knew "what the mass is because I do have the CT."

¶ 40    Gore testified that the standard of care required Chung to review the CT images next to the ultrasound images. Gore was an ACR fellow, and the ACR practice guideline for communication of diagnostic imaging findings supported his opinions regarding the standard of care. The guideline provided that, when there is a previous exam of the same body part, the radiologist should compare the "current exam with the older exam if it's available and the same body part." The ACR guideline stated that it was not intended to establish a legal standard of care and cautioned against its use in litigation but also suggested that a radiologist taking a substantially different approach from the guideline explain or document why in the medical record. Gore considered the guideline "a good, safe, prudent standard medical practice, radiology practice."

¶ 41    Chung had testified in his deposition that it was his custom and practice, as well as the standard of care, to look at prior examinations of the same body part. Gore testified that Chung violated the standard of care by not mentioning the teratoma identified on the August 11 CT report as a comparison study in his ultrasound report and by describing both ovaries as unremarkable in

his report. If Chung had been aware of the CT showing the teratoma, he should have stated so in his ultrasound report. If he did not review the CT, he should have found the CT report and included it in his ultrasound report.

¶ 42    When Chung was preparing his August 11 ultrasound report, the CT scan performed earlier that day did not automatically populate in the system to show that it had been performed, but the requisition form in the system showed that the CT scan was available for a comparison study. Gore acknowledged that the teratoma diagnosis on the CT report remained valid regardless of Chung's ultrasound report. He also acknowledged that ultrasound reports prepared by other physicians in March 2013 did not indicate that Marilyn had a large ovarian teratoma. The first time any physician described a problem with Marilyn's left ovary based on an ultrasound was on April 15, 2013.

¶ 43                                    2. Dr. Davide Bova

¶ 44    Dr. Davide Bova, a board-certified radiologist and former head of the Chicago Radiological Society, testified as an expert for St. Alexius and Chung. It was Bova's opinion that Chung complied with the standard of care when he interpreted and reported on the August 11, 2012, ultrasound images. Bova agreed with Chung's ultrasound report findings and testified that, from his review of the ultrasound images, there was evidence of an unremarkable left ovary and that there was no adnexal mass, teratoma, or any significant ovarian mass. Chung complied with the standard of care when he did not compare the CT scan with the ultrasound because they look at different structures and diseases. There were "no elements" in the ultrasound images that would have prompted Chung to look for another study, and there was no reason for Chung to reference the CT or teratoma in his ultrasound report.

¶ 45    Plaintiff's counsel examined Bova regarding Chung's deposition testimony. Chung had testified that his "standard practice would be to look at the CT examination in conjunction with

the ultrasound" and he did not report the teratoma in his ultrasound report because it would have been redundant. Plaintiff's counsel also asked Bova about Chung's initial Rule 213(f) disclosure:

"Q. Fourth paragraph: 'Dr. Chung will further testify that based on his custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's finding of the teratoma. Further, he will testify that it was also his custom and practice to compare the ultrasound to the CT at that time. He will testify that even though the report states there was no comparison, it was his custom and practice to compare the films and likely did so in 2012.' Did I read that correctly?

A. Yes, sir."

¶ 46     During Bova's testimony, he used a PowerPoint exhibit that included sagittal or side view images he reconstructed from the CT images taken on August 11, 2012. To create the new images, Bova used a software program that was "freeware downloadable from the internet." Chung did not have the sagittal images when he interpreted the ultrasound images on August 11, 2012. Plaintiff's counsel objected to Bova's use of the sagittal images based on Rule 213(f), noting that they were not disclosed to plaintiff until the morning of Bova's testimony. The court overruled plaintiff's objection, finding that they were being used as demonstrative exhibits. Using one of the sagittal images, Bova testified that the teratoma was located "immediately above the field of view" of the ultrasound images. The teratoma "was big enough that it pushed itself outside of the pelvis, and, therefore, was never in the field of view." In every ultrasound taken from October 2011 to April 2013, Bova did not see a teratoma, as it was always outside the field of view.

¶ 47                          3. DelCarmen

¶ 48    DelCarmen, a professor and board-certified physician in obstetrics, gynecology, and gynecologic oncology, testified as an expert for plaintiff. The August 11, 2012, CT report showed that Marilyn had a 7 by 6.3 centimeter teratoma on her left ovary. Given the size of the teratoma, Marilyn probably had it for years. An ovary with a "tennis-sized" ball teratoma attached was not normal or "unremarkable." On cross-examination, DelCarmen acknowledged that, even with a growing teratoma, the ovary could be documented as "normal" on an ultrasound.

¶ 49    According to DelCarmen's review of the record, Michael relied on Chung's ultrasound report in concluding that Marilyn did not have a teratoma. DelCarmen testified that Michael's reliance was a proximate cause of Marilyn developing metastatic cancer; if the teratoma had been removed in August 2012, she would not have developed cancer. Asked how a seven-centimeter teratoma could attach to a two-centimeter ovary, DelCarmen explained that an ovary expands when there is a growth on it. "You can blow a bubble but still have a little bit of gum left in your mouth. *** so normal ovary, and then an expansion essentially around it of also ovarian tissue that forms the cyst, but still have a part of that ovary that looks normal on either visual inspection or by imaging." The August 11 ultrasound did not negate the finding of the teratoma on the CT scan.

¶ 50                     4. Dr. Yvonne Gomez-Carrion

¶ 51    Dr. Yvonne Gomez-Carrion, a physician board-certified in obstetrics and gynecology, testified as an expert for plaintiff. She reviewed the August 11 CT report and identified a 7 by 6.3 centimeter teratoma on Marilyn's left ovary. Gomez-Carrion reviewed the August 11 ultrasound report and could "not clearly" identify a left ovary. She testified that Michael violated the standard of care by failing to, by contacting a radiologist or in some other manner, resolve the difference between the August 11 CT report identifying a seven-centimeter teratoma and the August 11

ultrasound report that Marilyn had "normal ovaries." She testified that Michael also violated the standard of care by failing to inform Karande that the CT report showed Marilyn had a teratoma. Michael's violations of the standard of care were proximate causes of Marilyn's death.

¶ 52                                5. Dr. Linda Holt

¶ 53    Dr. Linda Holt, a physician specializing in obstetrics and gynecology, testified as an expert for Michael. An ultrasound is "considered the first line evaluation and the standard evaluation for imaging ovaries." She testified that Michael complied with the standard of care. It was appropriate for him to rely on the CT and ultrasound reports and to conclude that Marilyn did not have a teratoma on August 16, 2012, because a teratoma would have made "the ovaries look abnormal."

¶ 54                                I. Jury Instructions

¶ 55    Illinois Pattern Jury Instructions, Civil, No. 105.10 (2011) (hereinafter IPI Civil No. 105.10) is the burden of proof instruction for claims based on apparent agency. Plaintiff submitted a modified jury instruction to add the words "or agent" to the IPI Civil No. 105.10 pattern instruction:

> "First, that St. Alexius held itself out as a provider of complete radiology care and that Marilyn Perez neither knew nor should have known that Dr. Chung was not an employee *or agent* of St. Alexius." (Emphasis added.)

The court refused plaintiff's modified instruction and gave unmodified IPI Civil No. 105.10 to the jury:

> "First, that St. Alexius Medical Center held itself out as a provider of radiological care and that Marilyn Perez neither knew or nor should have known that Dr. Jeffrey Chung, M.D. was not an employee of St. Alexius Medical Center."

The trial court also refused plaintiff's request to give IPI Civil No. 50.10, entitled "Agent or Independent Contractor."

¶ 56                    J. Verdicts and Posttrial Motions

¶ 57    The jury returned a verdict in favor of plaintiff against Michael and Suburban for $25 million. The jury returned a verdict in favor of defendants Chung and St. Alexius against plaintiff, expressly finding that Chung was not the apparent agent of St. Alexius. After trial, pursuant to a settlement for $1 million, the court dismissed Michael and Suburban as defendants with prejudice.

¶ 58    The court denied plaintiff's posttrial motion and his motion to amend his posttrial motion. The court also struck plaintiff's "Verified Local Rule 23.9 Petition to Issue Rule to Show Cause" against Chung. The allegation that plaintiff raised in his contempt petition and wanted to add to his posttrial motion was that Chung committed perjury because his testimony in another case (Estate of Newberry v. Iza, No. 14 L 7734 (Cir. Ct. Cook County)), after the trial herein, regarding his use of St. Alexius's "requisition forms" completely contradicted his testimony here. Specifically, Chung allegedly testified in the other case that, in interpreting ultrasounds, he reviewed the requisition forms referencing the patient's previous examinations, while in this case he testified that he never looked at the form when interpreting ultrasound images. This appeal followed.

¶ 59                              III. ANALYSIS

¶ 60    On appeal, plaintiff contends that the jury's finding that Chung was not the apparent agent of St. Alexius was against the manifest weight of the evidence. He contends that the trial court erred by refusing to give his modified jury instruction IPI Civil No. 105.10 and IPI Civil No. 50.10. He contends that the court erred by barring him from using Chung's Rule 213(f) disclosure, by barring him from examining Chung with the ACR practice guideline, and by allowing Bova to use

certain images during his testimony even though defendants did not disclose them until the morning of Bova's testimony. Plaintiff also contends that the cumulative effects of the court's errors denied him a fair trial and warrants a new trial against both defendants. Lastly, he contends that the court erred by striking his petition for adjudication of criminal contempt against Chung and by denying his motion to amend his posttrial motion to include his perjury allegation. Defendants contend that the two-issue rule precludes plaintiff from establishing reversible error. We shall address these contentions in a different order than just described.

¶ 61                                    A. Chung's Rule 213(f)(3) Disclosure

¶ 62    Plaintiff contends that the trial court erred by barring him from using Chung's Rule 213(f)(3) disclosure against defendants. He asserts that Chung's Rule 213(f)(3) disclosure is an evidentiary admission under Illinois Supreme Court Rule 213(h) (eff. Jan. 1, 2018), Illinois Supreme Court Rule 212(a)(2) (eff. Jan. 1, 2011), and Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015). Plaintiff claims that, by barring him from using Chung's Rule 213(f)(3) disclosure, the court prevented him from undermining defendants' defense at trial.

¶ 63    Chung filed his initial answer to plaintiff's Rule 213(f)(3) interrogatories, which his counsel signed, in January 2017. The initial disclosure stated in relevant part:

> "Dr. Chung will further testify that based on his custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's finding of the teratoma. Further, he will testify that it was also his custom and practice to compare the ultrasound to the CT scan at that time. He will testify that even though the report states there was no comparison, it was his custom and practice to compare the films, and likely did so in 2012."

16

In August 2017, Chung filed updated answers to plaintiff's Rule 213(f)(3) interrogatories, which his counsel signed. The updated disclosure stated in relevant part:

> "Dr. Chung will further testify that based on his custom and practice, he reviews relevant CT scans and reports when interpreting ultrasound imaging. Further, he will testify that it was also his custom and practice to compare the ultrasound to the CT if there was a question or difficulty in interpreting the ultrasound, which was not the case on the August 11, 2012 ultrasound."

Plaintiff claims that defendants argued at trial that Chung did not know about the teratoma when he reviewed the ultrasound and that barring plaintiff's use of Chung's Rule 213(f)(3) disclosure allowed defendants to hide from the jury Chung's admission in his disclosure that he had been aware of the teratoma when he reviewed the ultrasound.

¶ 64    As an initial matter, defendants assert that plaintiff forfeited the issue by failing to submit an offer of proof. "The purpose of an offer of proof is to disclose the nature of the offered evidence to which objection is interposed, for the information of the trial judge and opposing counsel, and to enable the reviewing court to determine whether the exclusion was erroneous and harmful." *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889, ¶ 68. Generally, an offer of proof is required to preserve for review a question as to whether the court properly excluded evidence, but an offer of proof may not be necessary if the record clearly shows that the trial court already had all of the evidence it needed to make an assessment regarding admissibility and possible prejudice from exclusion. *Id.* We find that plaintiff did not forfeit this contention for lack of an offer of proof because we find that on this record that the trial court had all the evidence it needed to make its evidentiary ruling.

¶ 65    Rule 213(f)(3) concerns a party's answer to written interrogatories regarding, as relevant here, "a person giving expert testimony who is the party, the party's current employee, or the party's retained expert." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). Illinois Supreme Court Rule 213(h) (eff. Jan. 1, 2018), provides that "[a]nswers to interrogatories may be used in evidence to the same extent as a discovery deposition." In turn, Rule 212(a) provided at all relevant times that a discovery deposition can be used as impeachment and "as an admission made by a party or by an officer or agent of a party in the same manner and to the same extent as any other admission made by that person." Ill. S. Ct. R. 212(a)(1), (2) (eff. Jan. 1, 2011). Illinois Rule of Evidence 801(d)(2) establishes that hearsay does not include a statement offered against a party when it is the party's own statement or "a statement by a person authorized by the party to make a statement concerning the subject." Ill. R. Evid. 801(d)(2)(A), (C) (eff. Oct. 15, 2015).

¶ 66    Admitting evidence under Rule 213 is a matter for the trial court's discretion and its ruling will not be disturbed absent an abuse of discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). This court held in *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 18 (2004), that when an attorney signs an interrogatory answer under Rule 213(f), rather than the expert disclosed in the answer, the answer can nonetheless be used as impeachment.

   "That the interrogatory answers may have been completed and signed by an attorney, as opposed to the expert, in our view, cannot justify modification of the plain meaning of the rule allowing impeachment. Courts have long understood that the answers to Rule 213 interrogatories surrounding experts are a collaboration between the expert and the retaining party." *Id.*

¶ 67    Here, the record shows that plaintiff's counsel wanted to use Chung's Rule 213(f)(3) disclosure as an evidentiary admission or alternatively as impeachment. The court and parties

discussed whether Chung's Rule 213(f)(3) disclosure could be used as an evidentiary admission multiple times during Chung's testimony. The court found that because the issue involved a party expert's Rule 213(f)(3) disclosure signed by the party's attorney as opposed to a nonparty expert disclosure signed by an attorney, the issue was different and the court was concerned about waiving the attorney client privilege. In one sidebar discussion, the court stated:

> "You know where I see the difference? If an expert did it, a retained expert, you can cross-examine the expert on the conversation that the expert had with the attorney because there's no privilege there. Were these the opinions that he gave? Did you talk to your attorney about these opinions? For an expert, that's where I see that that would be an appropriate line of questioning. *** But for the defendant, I'm not sure that I'm comfortable with you getting into any discussions that may have occurred between the attorney and the client."

¶ 68    However, we consider it key that Rule 213(f)(3) does not distinguish between "the party, the party's current employee, or the party's retained expert." See Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). All are controlled expert witnesses so long as they are giving expert testimony, and Rule 213(f)(3) requires that "[f]or each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." *Id.* In short, Rule 213(f)(3) does not support the distinction made by the trial court in allowing the use of Chung's disclosure of his intended testimony in examining expert witnesses but not Chung himself. We find *York* persuasive; if a party's retained expert can be impeached with a disclosure by the party's attorney, as *York* holds, it is not a leap of law or logic to hold a

disclosure by the party's attorney against the party himself. The Rule 213(f)(3) disclosure on behalf of Chung as a defendant stated what Chung himself would testify to as a witness.

¶ 69    With all that in mind, we consider it an absurd result to hold as the trial court did that Chung's expert witness could be confronted with the disclosure but Chung could not. Due to an earnest but excessive concern over attorney-client privilege, the trial court allowed the possibility that Chung would attribute the inconsistency to his attorney to deprive plaintiff of the ability to have Chung himself explain the inconsistency between the discovery disclosure as Chung's statements and Chung's own trial testimony.

¶ 70    As to prejudice, the trial court did allow plaintiff to use Chung's Rule 213(f)(3) disclosure for some purposes during the trial. Plaintiff's counsel read Chung's disclosure verbatim during the testimony of defendants' experts and referred to it during closing argument:

> "Those were his 213 disclosures after his deposition. Custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's findings of the teratoma. It was also his custom and practice to compare the ultrasound to the CT at that time."

Also, during Chung's testimony, the court permitted plaintiff's counsel to play a video of Chung's discovery deposition testimony in which he admitted knowing about the teratoma when he was reviewing the ultrasound. The following colloquy from Chung's discovery deposition was played at trial during Chung's testimony:

> "Q. So when you were looking at these images of this ultrasound, were you doing so with the teratoma in mind that you knew was identified on the CT from two hours earlier?
>
> A. Well, to answer the question, yes, but that's not the only thing I'd be concerned about or looking at or trying to evaluate."

20

¶ 71 However, we find prejudicial error in not allowing plaintiff to confront Chung in cross-examination with his Rule 213(f)(3) discovery disclosure. Chung disclosed before trial that he would have reviewed the CT scan and reports from August 11, 2012, would have been aware of the teratoma finding from the CT scan, and it was his custom and practice to compare the ultrasound to the CT scan even if his report stated otherwise. Plaintiff should have been able to confront Chung with the stark contrast between that statement and his trial testimony, not only as impeachment of Chung's credibility but as Chung's admission tending to show his awareness of the teratoma finding from the CT scan and his awareness that not comparing the CT scan and ultrasound was not proper care. Similarly, while Chung was confronted with his deposition testimony obliquely admitting that he was aware of the teratoma finding when he read the ultrasound, we find that evidence does not have the same effect as confronting Chung with the full impact of the discovery response at issue: that he would have reviewed the CT scan and report, would have been aware of the teratoma finding from the CT scan and report, and would have compared the ultrasound to the CT scan even if his report stated otherwise.

¶ 72 In sum, we find that the trial court erred by not allowing Chung's Rule 213(f)(3) discovery disclosure to be used in cross-examining Chung at trial and that plaintiff was prejudiced thereby.

¶ 73                              B. ACR Practice Guideline

¶ 74 Plaintiff contends that the trial court erred by barring him from examining Chung about the ACR practice guideline that, if there is a prior exam of the same body part, a radiologist should compare the current exam with the prior exam if it is available.

¶ 75 Defendants respond that plaintiff forfeited the issue by failing to make an offer of proof. Based on our review of the record, we find the issue was not forfeited because the court had the information it needed to make its decision on whether to allow the testimony. See *Sekerez*, 2011

IL App (1st) 090889, ¶ 68. Plaintiff's expert Gore testified about the guideline before Chung's testimony. Thus, when the court had to decide whether to allow testimony about the guideline during Chung's cross-exanimation, the court had already heard testimony from Gore about the guideline and its standard of care. Also, when defendants objected during Chung's cross-examination about the guideline, the parties discussed the guideline and what plaintiff's counsel believed Chung's testimony would be, stating: "Our expert says that it supports his opinion of the standard of care. And I bet this witness is going to say the exact same thing, that he agrees with these principles and I mean—He will say that they support his opinion of the standard of care."

¶ 76    Decisions on the admission of evidence will not be disturbed absent an abuse of discretion. *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 27.

> "A learned text can be used for impeachment on cross-examination in any of the following three circumstances: (1) the trial court takes judicial notice of the author's competence; (2) the witness concedes the author's competence; or (3) the cross-examiner proves the author's competence by a witness with expertise in the subject matter." *Id.*

If a publication is established as authoritative, an expert who does not recognize the publication may nonetheless be cross-examined with it. *Iaccino v. Anderson*, 406 Ill. App. 3d 397, 408 (2010).

¶ 77    Here, the trial court placed great weight on the fact that Chung was not a member of the ACR and was unfamiliar with the guideline. However, as stated above, an expert witness can be cross-examined with an authoritative text he is not previously familiar with. While the guideline's preamble stated it was not intended to establish a legal standard of care and cautioned against using the guideline in litigation, plaintiff's expert Gore, familiar with the guideline, testified that it supported his opinions on standard of care and was "a good, safe, prudent standard *** radiology practice." We find that plaintiff proved the guideline's competence or authoritativeness with the

testimony of an expert witness familiar with the guideline so that plaintiff should have been allowed to cross-examine Chung regarding the guideline.

¶ 78    As to prejudice, we find that the court's ruling barred plaintiff from asking Chung what he thought of the guideline and to explain his decisions in light of the guideline. It is true that the jury heard about the content of the guideline from Gore's testimony:

> "The guideline says that if you've got an old exam of the same body part, you know, it's your duty to the patient to compare your current exam with the older exam if it's available and the same body part. And that's just good medical practice, you know, irrespective of what this guideline says."

However, plaintiff was not allowed to confront Chung himself with the guideline to attempt to elicit an admission from Chung that the guideline described good medical practice and an explanation of his decisions compared to the guideline. We conclude that the trial court abused its discretion and committed reversible error by not allowing plaintiff's counsel to cross-examine Chung about the ACR guideline.

¶ 79                                    C. Apparent Agency Instruction

¶ 80    Plaintiff also contends that the trial court did not properly instruct the jury regarding apparent agency. Plaintiff contends that the court erred by refusing to give his modified version of IPI Civil No. 105.10, arguing that IPI Civil No. 105.10 as it stood at the time of trial did not accurately state the law regarding a plaintiff's burden of proof on apparent agency because it referenced only employees and not agents generally.

¶ 81    Under the doctrine of apparent agency, when a physician is not an employee of the hospital but is an independent contractor, a hospital may be held liable for a physician's negligence. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006). For a hospital to be

liable under the apparent agency theory, a plaintiff must prove that (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the alleged negligent physician was an employee or agent of the hospital; (2) the acts of the agent created the appearance of authority and "the plaintiff must also prove that the hospital had knowledge of and acquiesced in them"; and (3) "the plaintiff acted in reliance upon the conduct of the hospital or its agent." (Internal quotation marks omitted.) *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993).

¶ 82     The first two elements of apparent agency are collectively called the holding out factor. *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 39. Under the holding out factor, "[i]f a patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Gilbert*, 156 Ill. 2d at 522-23. Thus, "if a patient is placed on notice of the independent status of the medical professionals with whom he or she might be expected to come into contact, it would be unreasonable for a patient to assume that these individuals are employed by the hospital." *York*, 222 Ill. 2d at 202. An important consideration in evaluating the holding out factor is whether a patient signed a consent form with unambiguous independent status disclaimer language, " 'because it is unlikely that a patient who signs such a form can reasonably believe that [his] treating physician is an employee or agent of a hospital when the form contains specific language to the contrary.' " *Mizyed*, 2016 IL App (1st) 142790, ¶ 40 (quoting *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 27).

¶ 83     The holding out factor does not require an express representation by the hospital that the person alleged to be negligent is an employee or agent but only that the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors. *Gilbert*, 156 Ill. 2d at 525. Similarly, the third element of justifiable

reliance is satisfied by showing reliance upon the hospital, rather than a specific physician, to provide medical care. *Id.*

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to *radiological readings* to the endless medical support services—will be provided by the hospital through its staff.' " (Emphasis added.) *Id.* at 525-26 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 857 (Wis. 1988)).

¶ 84    IPI Civil No. 105.10 is entitled "Claims Based On Apparent Agency—Both Principal And Agent Sued—Principal Sued Under Respondeat Superior Only—Medical Malpractice Actions—Reliance On Principal Alleged." In other words, IPI Civil No. 105.10 is the burden of proof instruction for claims based on apparent agency. Our supreme court has stated that a "trial court is required to use an Illinois Pattern Jury Instruction when it is applicable in a civil case after giving due consideration to the facts and the prevailing law, unless the court determines that the instruction does not accurately state the law." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). The Illinois Supreme Court Rules likewise provide that, "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines

that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013).

¶ 85    The trial court has discretion in determining which instructions to give the jury, and we will not disturb its decision absent an abuse of discretion. *Luye v. Schopper*, 348 Ill. App. 3d 767, 773 (2004). "When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law." *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 813 (2008). However, when the issue is whether the jury instructions accurately stated the law, our review is *de novo*. *Doe v. Bridgeforth*, 2018 IL App (1st) 170182, ¶ 66. "In either case, '[a] reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant.' " *Id.* (quoting *Schultz*, 201 Ill. 2d at 274).

¶ 86    Here, the jury instruction on apparent agency made no mention of agency but referred strictly to whether Chung was an employee. While the instruction was based on IPI Civil No. 105.10, it is axiomatic as stated above that pattern instructions may be modified if they do not accurately state the law. We find that IPI Civil No. 105.10 at the time of trial, and the jury instruction in this case based upon it, did not accurately state the law. We find persuasive support for our conclusion in the 2019 revision of IPI Civil No. 105.10 to include the words "agent or" before the word "employee," thus rendering it consistent with case law. See Illinois Pattern Jury Instructions, Civil, No. 105.10 (revised May 2019).

¶ 87    We also find that the instruction at issue was misleading. In a medical malpractice context, a hospital's liability is based on whether the patient is placed on notice of the "independent status of the medical professionals with whom he or she might be expected to come into contact." *York*,

222 Ill. 2d at 202. We find that the consent form presented to Marilyn, in a perfunctory manner while she was in pain, was ambiguous and inadequate to convey whether Chung was independent of St. Alexius. The jury, erroneously instructed to focus on whether Marilyn "neither knew nor should have known that [Chung] was not an employee of St. Alexius," was likely to give undue weight to Chung's testimony that he was not an employee of St. Alexius.

¶ 88    We find the consent form ambiguous or inadequate in two distinct manners. The first is that the phrasing that "any or all physicians, residents, or medical students *** are NOT AGENTS OR EMPLOYEES OF THE HOSPITAL" requires some parsing. The construction "any or all X are not Y" is not the clearest phrasing when contrasted with something unambiguous like "no X is a Y." See *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶¶ 5, 24 (a consent form stating " 'I acknowledge and fully understand that some or all of the physicians who provide medical services to me at the hospital are not employees or agents of the hospital' " was found to be "ambiguous in that one could assume that some or all or none of the treating physicians are independent contractors, and that independent physicians may or may not include cardiologists"). Even a detail-oriented PhD like Marilyn may well have trouble parsing St. Alexius's language as it intended—that no physicians at St. Alexius are its agents or employees, rather than that some are not—while in severe pelvic pain and being told "to sign here, here, here."

¶ 89    The second flaw is that, assuming *arguendo* that Marilyn knew that no physician providing her service at St. Alexius was its employee or agent, it does not follow that she knew that the service of interpreting scans and tests performed in the St. Alexius emergency room would be provided by physicians. As recited above, it is unlikely that a patient who signs a release form can reasonably believe that her treating physicians, with whom she comes in contact, are employees or agents of the hospital when the form states otherwise. However, a patient may not realize in

27

reading and signing such a form that the service of interpreting test results, a radiological reading as the *Gilbert* court tellingly stated, was treatment that would be performed by a physician. In other words, a patient such as Marilyn may not recognize Chung as a treating physician or a physician who provided her service as the consent form put it. Instead, such a patient may recognize such an unseen service provider as an anonymous functionary in, as the *Gilbert* court described, the medical support services provided as part of the complete emergency care at St. Alexius. The fact that we and the jury know with hindsight from the entire trial evidence that Marilyn's ultrasound was interpreted by physician Chung does not determine what Marilyn knew when she signed the consent form and medical services were provided to her at St. Alexius.

¶ 90    We find a significant probability that the jury, presented with all the trial evidence and instructed to focus on whether Marilyn knew or should have known that Chung was not an employee of St. Alexius, would unduly under weigh what Marilyn knew and the limitations of what the consent form would inform her and unduly overweigh the evidence that her ultrasound was interpreted by Chung, a physician, who testified to not being an employee of St. Alexius. In sum, we find that the failure to modify IPI Civil No. 105.10 as requested by plaintiff was reversible error.

¶ 91                                    D. Two-Issue Rule

¶ 92    We have found reversible error on the preceding three contentions. However, defendants contend that the two-issue rule precludes plaintiff from establishing reversible error. The two-issue or general verdict rule provides that a general verdict for the plaintiffs or the defendants without special interrogatories will not be disturbed if the case involved two or more determinative issues, or two or more theories were presented, and there was sufficient evidence to support at least one of the issues or theories that was free from prejudicial error. *Obermeier v. Northwestern Memorial*

*Hospital*, 2019 IL App (1st) 170553, ¶ 51; *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369,

¶ 44. Here, defendants contend that the rule applies here because the verdict in favor of Chung

may well have hinged on proximate causation rather than whether Chung breached the standard of

care, while all of plaintiff's contentions regarding Chung concern standard of care.

¶ 93    Plaintiff responds by correctly noting that the jury was duly instructed to first determine

whether Dr. Chung was negligent before reaching the issue of proximate causation. We find a

significant probability that the errors regarding Chung's negligence caused the jury to not reach

proximate causation at all. We therefore will not apply the two-issue or general verdict rule here.

¶ 94                    E. Manifest Weight of the Evidence

¶ 95    Having found reversible error in the trial here based on the preceding contentions, we are

remanding this case for a new trial against both Chung and St. Alexius. Because of the prejudicial

errors in the trial itself, we need not address plaintiff's contention that the verdict in favor of St.

Alexius regarding apparent agency was against the manifest weight of the evidence. Our usual

deference to a jury's verdicts does not extend to a trial with reversible errors such as this one.

¶ 96                        F. Actual Agency Instruction

¶ 97    Plaintiff contends that the trial court did not give a jury instruction based on IPI Civil No.

50.10 as he requested. Noting that IPI Civil No. 50.10 defines the words "agent" and "independent

contractor," he contends that an important issue at trial was whether Chung was an independent

contractor or agent and that the jury needed an instruction defining these terms. We shall address

this contention in detail because it could arise again in a new trial following remand.

¶ 98    St. Alexius responds that plaintiff never pled an actual agency claim, that IPI Civil No.

50.10 is an actual agency instruction, and thus that the court's refusal to give it was proper. St.

Alexius also argues that plaintiff failed to prove that an actual agency relationship existed. In

plaintiff's reply, he does not dispute that he failed to plead a claim based on actual agency or that he proved that an actual agency relationship existed.

¶ 99    IPI Civil No. 50.10 states:

"The question has been raised whether at the time of the occurrence [alleged agent's name] was the agent of the defendant [defendant's name] or was an independent contractor. An agent is a person who by agreement with another, called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair, or does some service for the principal, with or without compensation. The agreement may be oral or written, express or implied. [The term 'agent' is broader than either 'servant' or 'employee.' A servant or employee is an agent, but one may be an agent although he is neither servant nor employee.]

[If you find that one person has the right to control the actions of another at a given time, you may find that the relation of principal and agent exists, even though the right to control may not have been exercised.]

An independent contractor is one who undertakes a specific job where the person who engages him does not have the right [to discharge him] [or] [to direct and control the method and manner of doing the work].

In determining whether at the time of the occurrence [alleged agent's name] was the agent of the defendant [defendant's name] or was an independent contractor, you may also consider [the method of payment;] [the right to discharge;] [the skill required in the work to be done;] [who provides tools, materials or equipment;] [whether the worker's occupation is related to that of the employer;] [whether the employer deducted for withholding tax;] [and] [other relevant factor(s)].

30

The principal is liable to third persons for the negligence of his agent in the transaction of the business of the principal, if the agent himself is liable. But one who engages an independent contractor is not liable to others for the negligence of the contractor."

¶ 100   We review a trial court's decision on whether to give a jury instruction under the abuse of discretion standard. *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶ 41. A court's refusal to give an instruction results in a new trial only if the party "shows serious prejudice to the party's right to a fair trial." *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 777 (1998).

¶ 101   Here, plaintiff's theory against St. Alexius was based on apparent agency, as plaintiff's counsel acknowledged at trial. During the discussion on IPI Civil No. 50.10, plaintiff's counsel stated: "the count is pled apparent agency, although there are two paragraphs in the count that makes the allegation 'agent,' but it's an apparent agency count." As previously discussed, the trial court gave IPI Civil No. 105.10, the instruction for apparent agency claims. Plaintiff has not cited any authority to support that IPI Civil No. 50.10, an actual agency instruction as we explain below, should also be given for claims based on apparent agency.

¶ 102   The first sentence of IPI Civil No. 50.10 sets forth that it is given when a question has been raised regarding whether the "alleged agent" was an "agent or independent contractor," as it states: "The question has been raised whether at the time of the occurrence [alleged agent's name] was the agent of the defendant [defendant's name] or was an independent contractor." Further, we have held that IPI Civil No. 50.10 "provides the factors by which a jury can determine whether a principal-agent relationship existed" (*Dahan*, 295 Ill. App. 3d at 777), which is the first element of actual agency (*Hammer*, 2016 IL App (1st) 143066, ¶ 15). IPI Civil No. 50.10 also instructs a jury that it may find an agent-principal relationship existed if it finds that "one person has the right

to control the actions of another at a given time." However, an apparent agency claim is not based on whether there was a principal-agent relationship but whether the hospital or alleged agent acted in a manner to lead a reasonable person to concluded that the physician was an employee or agent and the acts of the agent created an apparent of authority. See *York*, 222 Ill. 2d at 179 (setting forth the elements of an apparent agency claim). Accordingly, IPI Civil No. 50.10 taken as a whole contains instructions for evaluating claims of actual agency.

¶ 103   As plaintiff did not raise an actual agency claim and IPI Civil No. 50.10 is an actual agency instruction, we cannot find that the court abused its discretion by refusing to give IPI Civil No. 50.10.

¶ 104                                    G. Remaining Issues

¶ 105   We shall briefly address the remaining contentions of error. Firstly, because we are remanding for a new trial, we need not address plaintiff's contention that a new trial is necessary because the cumulative effect of the trial errors deprived him of a fair trial.

¶ 106   Secondly, we need not address plaintiff's contention that the trial court erred by allowing Bova to rely on undisclosed sagittal CT images during his testimony over plaintiff's objection that defendants violated Illinois Supreme Court Rule 237 (eff. Jul. 1, 2005) and Illinois Supreme Court Rule 213(i) (eff. Jan. 1, 2018). This contention, based on an alleged failure in timely discovery disclosure, is unlikely to recur in a new trial.

¶ 107   Lastly, plaintiff contends that the trial court erred by striking his contempt petition against Chung and by denying him leave to amend his posttrial motion.

¶ 108   Plaintiff's contempt petition and requested amendment to his posttrial motion alleged that Chung gave inconsistent testimony in this trial and in a subsequent trial in an unrelated case. Specifically, Chung testified in the May 2018 trial here that he does not "ever look at or use" the

ultrasound requisition form in interpreting scans, while he allegedly testified in the other trial in July 2018 that he will "look and see how old the patient is and also what exam is being ordered, and then, as well, I'll look at what history is provided."

¶ 109   Chung responds that plaintiff forfeited this contention because his brief failed to comply with Illinois Supreme Court Rule 341(h) (eff. May 25, 2018). He argues that plaintiff made conclusory claims and underdeveloped arguments without citation to relevant authority. The content and format of appellate briefs are governed by Rule 341(h), providing that an appellant must "present reasoned argument and citation to legal authority and to specific portions of the record in support of his claim of error." *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 15. An issue that is not clearly defined and sufficiently presented, and thus does not satisfy Rule 341(h), is forfeited. *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33. Upon reviewing the briefs, we find that plaintiff has indeed failed to provide reasoned and legally supported argument regarding his contempt petition against Chung, but we find sufficiently reasoned and supported argument on the broader question of Chung's allegedly inconsistent testimony to not find the broader contention forfeited.

¶ 110   However, while plaintiff has not waived that portion of his contention, the fact that we are remanding for a new trial means that we need not consider plaintiff's contention regarding amending his posttrial motion. We do not address the substance of whether the particular testimony in this case and the unrelated case are contradictory as alleged, or whether Chung's testimony in the unrelated case is admissible here, but leave it for the trial court to decide in the course of litigation following remand if the issue is presented again.

¶ 111                                   IV. CONCLUSION

¶ 112    Accordingly, the judgment in favor of Chung and St. Alexius is vacated, and this case is remanded for a new trial regarding both defendants.

¶ 113    Vacated and remanded.


¶ 114    JUSTICE CONNORS, dissenting:

¶ 115    I respectfully dissent. The jury's finding that Chung was not the apparent agent of St. Alexius was not against the manifest weight of the evidence. The trial court did not commit reversible error with respect to its evidentiary rulings.

¶ 116                        A. Chung's Initial Rule 213(f)(3) Disclosure

¶ 117        The trial court did not commit reversible error when it barred plaintiff from using Chung's initial Rule 213(f) disclosure during Chung's testimony.

¶ 118        As an initial matter, I disagree with the majority that plaintiff preserved his argument despite his failure to make an offer of proof. Plaintiff's counsel acknowledged at trial that he needed to make an offer of proof. During a sidebar discussion on the Rule 213(f)(3) issue, plaintiff's counsel objected to the court's refusal to allow Chung to read the initial Rule 213(f)(3) disclosure during Chung's cross-examination and then his other counsel stated to the court: "We might still—I don't know—at some point need an offer of proof opportunity. Not today. I mean …" The court responded, "[w]henever you want. Whenever you want." However, the record does not show that plaintiff ever made an offer of proof. Further, on appeal, plaintiff does not argue that he ever made one, and plaintiff's counsel acknowledged at oral argument that there was no offer of proof made. Because plaintiff did not make an offer of proof, I find that the issue is forfeited.

34

¶ 119    The trial court did not have all the evidence it needed to make its evidentiary ruling because an offer of proof could have addressed the concerns that the trial court had about waiving the attorney client privilege. As the majority discussed, the court was concerned about waiving the attorney client privilege because the issue here involved a party expert's Rule 213(f)(3) disclosure signed by the party's attorney as opposed to a nonparty expert disclosure signed by an attorney. During the first sidebar discussion in Chung's adverse examination regarding Chung's initial Rule 213(f)(3) disclosure, the court noted that it was not comfortable "with you getting into any discussion that may have occurred between the attorney and the client" and that it was concerned about issues with the initial disclosure and the attorney client privilege. If counsel had provided an offer of proof, counsel could have demonstrated how his questions would not have violated the attorney client privilege and the court could have determined whether it had valid concerns that counsel's examination would interfere with the attorney client privilege.

¶ 120    Nevertheless, even if I would agree with the majority and find that plaintiff's argument was not forfeited, I would not find that reversible error occurred. We will not disturb a judgment when "it appears an error did not affect the outcome of the trial" or where we "can see from the entire record that no harm has been done." *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991). "An incorrect evidentiary ruling does not warrant reversal unless the error materially affected the outcome of the trial." *Karn v. Aspen Commercial Painting, Inc.*, 2019 IL App (1st) 173194, ¶ 19. It was plaintiff's burden to establish prejudice. *Jackson*, 210 Ill. App. 3d at 471.

¶ 121    Based on my review of the record, I would conclude that the trial court's ruling on Chung's initial Rule 213(f)(3) disclosure did not affect the outcome of the trial. Plaintiff therefore has not established prejudice. Although plaintiff's counsel was not permitted to examine Chung with his initial Rule 213(f)(3) disclosure during Chung's adverse examination, the jury

nevertheless heard the content of Chung's initial disclosure at various times during trial. In fact, during the testimony of defendants' expert, plaintiff's counsel read Chung's initial Rule 213(f)(3) disclosure to the jury verbatim:

"Q. Fourth paragraph: 'Dr. Chung will further testify that based on his custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's finding of the teratoma. Further, he will testify that it was also his custom and practice to compare the ultrasound to the CT at that time. He will testify that even though the report states there was no comparison, it was his custom and practice to compare the films and likely did so in 2012.' Did I read that correctly?

A. Yes, sir."

¶ 122    Further, during Chung's testimony, plaintiff's counsel played a video of Chung's discovery deposition testimony, which was similar to Chung's initial Rule 213(f)(3) disclosure, as he testified in his discovery deposition that he knew about the teratoma when he was reviewing the ultrasound. The video, which was played at trial two times, contained the following colloquy from Chung's discovery deposition:

"Q. So when you were looking at these images of this ultrasound, were you doing so with the teratoma in mind that you knew was identified on the CT from two hours earlier?

A. Well, to answer the question, yes, but that's not the only thing I'd be concerned about or looking at or trying to evaluate."[1]

In addition, during plaintiff's closing argument, plaintiff's counsel argued about Chung's initial Rule 213(f)(3) disclosure, stating:

---

[1]The record shows that after the deposition testimony was played one time on the videotape, plaintiff's counsel asked "Can we get it louder? Let's start it over." The videotape with the deposition testimony was then played a second time.

"Those were his 213 disclosures after his deposition. Custom and practice, he would have reviewed the CT scan and reports from August 11, 2012, and would have been aware of Dr. Gullo's findings of the teratoma. It was also his custom and practice to compare the ultrasound to the CT at that time."

Accordingly, even though plaintiff's counsel did not examine Chung on his initial Rule 213(f)(3) disclosure, the jury heard the content of Chung's initial disclosure at trial multiple times, and I am unpersuaded by plaintiff's assertion that the court allowed defendants to "hide" from the jury Chung's admission in his initial disclosure that he had been aware of the teratoma when he reviewed the ultrasound. Plaintiff has therefore failed to demonstrate that the jury's verdict would have been different had the trial court allowed him to examine Chung about Chung's initial disclosure.

¶ 123                        B. ACR Practice Guideline

¶ 124        Further, I would find that no error occurred when the trial court barred plaintiff from cross-examining Chung—who had never been a member of ACR—about the ACR practice guideline.

¶ 125        Decisions on the admission of evidence will not be disturbed absent an abuse of discretion. A trial court's evidentiary ruling is considered an abuse of discretion when it is arbitrary, fanciful, or unreasonable. *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 27. We may only find an abuse of discretion when no reasonable person would take the view adopted by the trial court. *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452 (2004).

¶ 126        Initially, I note that the majority cites *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 27, for the proposition that a "learned text" can be used for impeachment on cross-examination if the witness concedes the author's competence, the court

takes judicial notice of the authors' competence, or "the cross-examiner proves the author's competence by a witness with expertise in the subject matter." However, here, this case did not involve a learned text or treatise that would satisfy the requirements of *Fragogiannis*.

¶ 127    The court did not take judicial notice of the author's competence. And plaintiff did not prove through Gore's testimony that the guideline was authoritative. I acknowledge that Gore testified that the guideline was a "good source" of information for diagnostic radiologists regarding communication of diagnostic imaging findings and that it was "just a good, safe, prudent medical practice." However, Gore also testified that the guideline did not represent inflexible rules, was not intended to establish a legal standard of care, and that the guideline's preamble cautioned against using the guideline in litigation. Further, although Gore testified that the guideline supported his opinions, he also testified that he did not rely on it and that it was not the basis for his opinion.

¶ 128    Cross-examining Chung would not have added value and plaintiff was not prejudiced when the court did not allow him to do so. The court allowed the jury to hear testimony about the standard of care provided in the guideline at various times during trial. In plaintiff's opening argument, over defense counsel's objection, plaintiff's counsel informed the jury that the ACR "has practice guidelines," which stated that "radiologists should compare examinations and reports when they're relevant and available." Then, during Gore's testimony, Gore expressly read the guideline to the jury and testified about it as follows:

>    "The guideline says that if you've got an old exam of the same body part, you know, it's your duty to the patient to compare your current exam with the older exam if it's available and the same body part. And that's just good medical practice, you know, irrespective of what this guideline says."

38

Further, during plaintiff's cross-examination of defendant's expert, Dr. Bova, plaintiff's counsel asked whether he was familiar with the "guideline that's been talked about." After Bova acknowledged he was familiar with it, counsel asked him, "You're familiar with relevant examinations and reports should be part of the radiologic consultation and report when appropriate and available. Do you agree with that?" Bova responded, "When appropriate and available I think is the key. Yes." Accordingly, the jury heard about the standard of care provided in the guideline several times during trial and plaintiff was not prejudiced by being unable to cross-examine Chung about it.

¶ 129    Because plaintiff's own expert testified that the guideline cautioned against its use in litigation and that it did not establish a standard of care and the jury heard about the standard of care provided in the guideline at multiple times during trial, I would find no reversible error occurred when the trial court did not allow plaintiff to cross-examine Chung about the guideline.

¶ 130                                C. Apparent Agency Instruction

¶ 131    I would also find that no error occurred when the trial court refused plaintiff's modified jury instruction for IPI Civil No. 105.10. The pattern jury instruction that was given adequately instructed the jury on the burden of proof for plaintiff's apparent agency claim.

¶ 132    The trial court gave the instruction for IPI Civil No. 105.10 that was in effect at the time of trial and that had been in effect since 2003. That the instruction was revised in 2019 does not necessarily mean that the instruction was incorrect in 2018. Neither the majority nor plaintiff has cited any authority to support that the instruction in effect at the time of trial incorrectly stated the law. Under Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013), the trial court here was required to use the IPI instruction that was in effect, unless it determined that it did not accurately state the law.

¶ 133    Nevertheless, even if the instruction inaccurately stated the law because it did not include the words "or agent," the instruction did not clearly mislead the jury or prejudice plaintiff. *Doe v. Bridgeforth*, 2018 IL App (1st) 170182, ¶ 66 (a reviewing court will not generally reverse a trial court for giving incorrect jury instructions unless they "clearly misled the jury and resulted in prejudice" (internal quotation marks omitted)).

¶ 134    As discussed by the majority, in a medical malpractice context, a hospital's liability is based on whether the patient is placed on notice of the "independent status of the medical professionals with whom he or she might be expected to come into contact." *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 202 (2006). Under the "holding out" factor in an apparent agency claim, if a patient "is placed on notice *** , it would be unreasonable for a patient to assume that these individuals are employed by the hospital." *Id.* Thus, the jury had to determine whether Marilyn knew about Chung's independent status and that he was not employed by St. Alexius. See *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508, 512 (2000) (stating that, under *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, (1993), the first relevant inquiry is whether the patient knew that the physician was not employed by the hospital). Given that the focus of an apparent agency claim in the medical malpractice context is on the independent status of the medical professional, I cannot find that the instruction that only included the word "employee" rather than "employee or agent" clearly mislead the jury in what it had to determine in order to conclude that Chung was not the apparent agent of St. Alexius, *i.e.*, whether Chung was independent of St. Alexius.

¶ 135    Any shortcomings related to the consent form do not change my conclusion. The consent form, which Marilyn signed, was presented clearly. The form contained bold print and capital letters expressly indicating Chung's independent status: "*INDEPENDENT STATUS OF*

*PHYSICIANS*: I recognize that any or all physicians, residents, or medical students (under the supervision of physicians and/or residents), who furnish services to me during this admission are INDEPENDENT CONTRACTORS and are NOT AGENTS OR EMPLOYEES OF THE HOSPITAL." (Emphasis in original.) This provision is separated from the other paragraphs on the form and the bold and capital letters make it plainly visible. Based on the express and clear language of the consent form, the jury could have reasonably concluded that Marilyn was placed on notice of Chung's independent status and that it would have been unreasonable for her to assume that he was an employee or agent of St. Alexius. See *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1088 (2009) (affirming summary judgment in favor of the hospital, and noting that the plaintiff "signed a consent form that clearly indicated that defendant contracted with independent physicians to provide services to patients" and that the physicians' status was " 'clearly set out' ").

¶ 136    In addition, there was no evidence that St. Alexius did anything to make Marilyn or Jesse believe that Chung was an employee or agent of St. Alexius or that they had inquired about whether any physicians were agents or employees of St. Alexius. See *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 56 (affirming summary judgment for the hospital based on an independent contractor disclaimer in a consent form and noting that there was no other evidence to support the "holding out" element, *i.e.*, no evidence showing that the plaintiff or his daughter had inquired, or that anyone had told them, whether any physicians were employees or agents of the hospital); *Frezados v. Ingalls Memorial Hospital*, 2013 IL App (1st) 121835, ¶¶ 5, 20-21 (affirming summary judgment for the hospital based on a disclaimer in a signed consent form coupled with no evidence showing that the hospital did anything to make the plaintiff believe the physician was the hospital's employee). Moreover, the evidence showed that Marilyn was highly

educated, and there is no evidence suggesting she expressed any confusion, did not understand the consent form, or that she asked questions about the form.

¶ 137    The majority asserts that even a detail-oriented PhD like Marilyn may have trouble "parsing" the language in the consent form while in severe pain when she was being told to "sign here, here, here." However, this court has previously stated that "one who signs a document is charged with knowledge of its contents, regardless of whether he or she actually read the document" (*Mizyed*, 2016 IL App (1st) 142790, ¶ 54) and that pain is not an excuse from reading the form before signing it (*Frezados*, 2013 IL App (1st) 121835, ¶ 24). Further, the act of legally signing a document signifies that the person had the opportunity to become familiar and comprehend its terms. *Mizyed*, 2016 IL App (1st) 142790, ¶ 54. In addition, immediately above the signature line and below the independent status disclaimer provision, the form states: "This form has been fully explained to me and I clarify that I understand and accept its contents, except as noted," from which the jury could reasonably conclude that Marilyn was placed on notice of the contents of the consent form.

¶ 138    *Hammer v. Barth*, 2016 IL App (1st) 143066, relied on by the majority is distinguishable. There, the consent form stated: " 'I acknowledge and fully understand that some or all of the physicians who provide medical services to me at the hospital are not employees or agents of the hospital' " and "[n]on-employed physicians may include, but are not limited to, those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties." *Id.* ¶ 5. The court found the disclaimer was ambiguous because "one could assume that some or all or none of the treating physicians are independent contractors, and that independent physicians may or may not include cardiologists." *Id.* ¶ 24.

¶ 139       Of note, *Hammer* was an appeal from a grant of summary judgment and found that there remained a question of fact that warranted reversal. Here, the jury decided the apparent agency issue based on all of the evidence presented, including the consent form and testimony that Chung was an employee of Midsuburban Radiological Associates, LLC, and St. Alexius did not hire and could not fire Chung and did not control his practice. Moreover, the "any or all" language here is not the same as the "some or all" language that *Hammer* found ambiguous. Neither the majority nor plaintiff have cited any authority finding the "any or all" language is ambiguous or that the "any" word in the provision is reasonably interpreted to exclude certain physicians.

¶ 140       Accordingly, the evidence presented to the jury, including the consent form, was sufficient for the jury to conclude that Marilyn was placed on notice of the independent status of Chung and that he was therefore neither an employee nor agent of St. Alexius. The IPI Civil No. 105.10 instruction that was given, and that only included the word "employee," was not misleading to the jury. I would also find that the consent form presented to Marilyn was not ambiguous or inadequate to convey that Chung was independent of St. Alexius.

¶ 141                         D. Unaddressed Issues by the Majority

¶ 142                         1. Manifest Weight of the Evidence

¶ 143       Although the majority did not address the jury's apparent agency finding, I will do so because I find no reversible errors occurred. As the majority discussed, for a hospital to be liable under the apparent agency theory, a plaintiff must prove (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the alleged negligent physician was an employee or agent of the hospital; (2) where the acts of the agent created the appearance of authority, "the plaintiff must also prove that the hospital had knowledge of and acquiesced in them"; and (3) "the plaintiff acted in reliance upon the conduct of the hospital or its agent."

43

(Internal quotation marks omitted.) *Gilbert*, 156 Ill. 2d at 525. Under the "holding out" factor, "if a patient is placed on notice of the independent status of the medical professionals with whom he or she might be expected to come into contact, it would be unreasonable for a patient to assume that these individuals are employed by the hospital." *York*, 222 Ill. 2d at 202. An important factor is whether a patient signed a consent form that contained unambiguous independent status disclaimer language. *Mizyed*, 2016 IL App (1st) 142790, ¶ 40.

¶ 144    A verdict is against the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's finding was unreasonable, arbitrary, and not based on the evidence. *Bowman v. University of Chicago Hospitals*, 366 Ill. App. 3d 577, 584-85 (2006). It is the jury's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide the weight to be given to the witnesses' testimony. *Lisowski v. MacNeal Memorial Hospital Ass'n*, 381 Ill. App. 3d 275, 282 (2008). As a reviewing court, we may not reweigh the evidence or substitute our judgment for that of the jury. *Bowman*, 366 Ill. App. 3d at 585.

¶ 145    The jury's finding that Chung was not the apparent agent of St. Alexius was not against the manifest weight of the evidence. As I discussed above, the evidence was sufficient for the jury to conclude that Marilyn was placed on notice of Chung's independent status and that he was not an employee or agent of St. Alexius. Thus, the jury's finding that Chung was not the apparent agent of St. Alexius was not unreasonable or arbitrary and, therefore, was not against the manifest weight of the evidence. We may not reweigh the evidence or substitute our judgment for that of the jury.

¶ 146                                    2. Dr. Bova and Sagittal CT Images

¶ 147       I will address plaintiff's argument related to Bova relying on undisclosed CT images over plaintiff's objection that defendants violated Rules 237 and 213(i) because I find that no reversible errors occurred.

¶ 148       Rule 237(b) states:

> "The appearance at the trial or other evidentiary hearing of a party *** may be required by serving the party with a notice designating the person who is required to appear. The notice also may require the production at the trial or other evidentiary hearing of the originals of those documents or tangible things previously produced during discovery." Ill. S. Ct. R. 237(b) (eff. Jul. 1, 2005).

Plaintiff asserts that he served attorneys for Chung and St. Alexius notices pursuant to Rule 237 about two months before trial and requested production of all demonstrative exhibits before the start of trial. He argues that defendants violated Rule 237 because St. Alexius did not produce Bova's PowerPoint slide, which included sagittal images created from Marilyn's actual CT images, until the morning of Bova's testimony.

¶ 149       With respect to plaintiff's argument that defendants violated Rule 213(i), this rule requires a party "to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2018). Plaintiff claims that defendants violated Rule 213(i) because Bova created new CT images that no one had seen until the last day of trial and Bova relied on these images as a basis for his testimony that the teratoma was not within the field of view of the ultrasound.

¶ 150       Initially, defendants assert that plaintiff forfeited the issue because he failed to make a contemporaneous objection during Bova's testimony. Defendants assert that plaintiff did not

45

object until Bova finished his testimony about the sagittal CT images. To preserve a claim for review, an objection must be contemporaneous with the objectionable conduct. *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 17 (2004). Here, the record shows that St. Alexius's counsel asked Bova numerous questions about the sagittal CT images before plaintiff objected based on Rule 213. Thus, plaintiff failed to make a timely contemporaneous objection and forfeited his challenge. See *id.* at 17-18 (concluding that the defendant forfeited his challenge by failing to make a timely objection, noting that "multiple references" to the objectionable testimony went unchallenged before the objection was made).

¶ 151      However, even if plaintiff properly preserved his claim, I would find that the trial court properly allowed Bova to testify about the sagittal CT images over plaintiff's objections that they were not timely disclosed or included in Bova's Rule 213(f) disclosure.

¶ 152      Here, the trial court allowed Bova to testify about the images, finding that the exhibits were demonstrative. Demonstrative evidence serves as a visual aid to the jury in comprehending the verbal testimony of a witness. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341 (1991). Demonstrative evidence is looked upon favorably by the courts because it allows the fact finder "to have the best possible understanding of the matters before it." *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 30. "The primary considerations in determining whether demonstrative evidence is admissible or may be used at trial are relevancy and fairness." *Yanello v. Park Family Dental*, 2017 IL App (3d) 140926, ¶ 31. With respect to relevancy, to be admissible, the evidence "must actually be used to illustrate or explain the verbal testimony of a witness as to a matter that is relevant." (Internal quotation marks omitted.) *Id.* With respect to fairness, demonstrative evidence may still be excluded by the trial court if " 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)). The admission of an exhibit as demonstrative evidence is within the sound discretion of the trial court. *Kayman v. Rasheed*, 2015 IL App (1st) 132631, ¶ 66. A trial court abuses its discretion when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *Id.*

¶ 153    Bova's Rule 213(f) disclosure stated that Bova would testify "to the tissues structures, vessels, and organs visualized by differing forms of medical imaging (plain film, US, MRI, CT, etc.). He *will testify to the limitations in visualizing various tissues, structures, vessels and organs with differing forms of medical imaging*." (Emphasis added.) Bova's Rule 213(f) disclosure also stated:

> "Dr. Bova will opine that reasonable careful radiologist w*ould not have been able to identify a teratoma on [Marilyn's] August 11, 2012, ultrasound. Even viewing the August 11, 2012, ultrasound retrospectively with knowledge of the teratoma based on the CT findings, no teratoma can be clearly seen on the ultrasound. Despite the presence of the teratoma on the August 11, 2012, CT, its absence on the August 11, 2012, ultrasound may be explained for one of two reasons. *** Either the teratoma was outside the field of view of the ultrasound* or the teratoma was unable to be viewed by the less sensitive ultrasound technology due to fecal matter or gas within the bowel obscuring the teratoma." (Emphasis added.)

At trial, Bova testified that the teratoma was located outside the field of view of the ultrasound, which was a subject identified in his Rule 213(f) disclosure stated above. He also testified that the teratoma was "was big enough that it pushed itself outside of the pelvis, and, therefore, was never in the field of view." Bova used CT images, including the sagittal views that he created from

47

Marilyn's actual CT images, to explain this verbal testimony that the teratoma was located outside the field of view of the ultrasound. Accordingly, I would not find that trial court's decision to allow Bova to testify about the sagittal images because they were demonstrative was arbitrary or unreasonable.

¶ 154    In addition, the trial court instructed the jury that the images were not evidence. The court stated: "the jury are cautioned that this is not evidence in this case, *** They're just showing—using this as demonstrative evidence, and it can only be used by the witness to explain his testimony." Finally, plaintiff was not prejudiced by Bova's use of the sagittal images to explain that the teratoma was located outside the view of the ultrasound. A disputed issue at trial regarding the standard of care was whether the standard of care required Chung to look at the CT report when he was reviewing the ultrasound and whether it required him to include the finding of the teratoma and CT report in his ultrasound report. Plaintiff's counsel conceded during closing argument that the issue was not whether Chung should have seen the teratoma on the ultrasound report, as he stated during closing argument: "Did you hear anyone on our side say that Dr. Chung should have seen the teratoma on the ultrasound? No. Ovaries show up on ultrasound, teratomas show up on CTs. *** So no one is saying that Dr. Chung should have looked at the ultrasound and seen the teratoma." Thus, plaintiff was not prejudiced when Bova used the sagittal images to aid the jury in understanding his testimony that the teratoma was located outside the field of view of the ultrasound.

¶ 155    Accordingly, the trial court did not abuse its discretion when it allowed Bova to testify about the sagittal CT images.

¶ 156                          E. Actual Agency Instruction

¶ 157       I agree with the majority that the trial court did not abuse its discretion when it refused to give IPI Civil No. 50.10, the instruction for an actual agency claim.

¶ 158                  F. Plaintiff's Contempt Petition Against Chung

¶ 159       I agree with the majority that plaintiff failed to set forth well-reasoned arguments with relevant and persuasive legal authority supporting how the trial court erred when it dismissed his contempt petition against Chung and so forfeited the issue. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Thus, I would find that plaintiff's arguments with respect to his contempt petition against Chung are forfeited because he failed to comply with Rule 341. See *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33 ("An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Rule 341(h)(7) and is, therefore, forfeited.").

¶ 160                          G. Two-Issue Rule

¶ 161       Finally, I disagree with the majority's conclusion that the two-issue rule does not apply. Under the two-issue rule, a " 'general verdict rendered by the jury creates a presumption that the jury found in favor of [a defendant] on every defense raised' [citation], as well as a presumption that 'all issues of fact upon which proof was offered were found in favor of the prevailing party' [citation]." *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 51. Under this rule, "we must presume that the jury found against plaintiff on every issue raised in the counts that were before it." *Id.*

¶ 162       To prove negligence, plaintiff must prove (1) the standard of care against which the medical professional's conduct must be measured, (2) negligent failure to comply with that standard, and (3) negligence proximately caused the injuries for which the plaintiff seeks redress.

*Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 292 (2008). Here, plaintiff's arguments on appeal are only relevant to the issue of Chung's standard of care. The jury returned a general verdict form in favor of Chung. Neither party submitted special interrogatories, so we cannot determine from the jury's general verdict whether any alleged errors in the court's evidentiary rulings regarding the standard of care affected the jury's verdict. See *Strino v. Premier Healthcare Associates, P.C.*, 365 Ill. App. 3d 895, 905 (2006) ("Because neither party submitted special interrogatories, we cannot determine from the general verdict whether any error in the contributory negligence instruction affected the verdict."). We therefore must presume that the jury found in favor of defendants and against plaintiff on every defense raised and on all issues of fact upon which proof was offered. Based on my review of the record, there was sufficient evidence presented to the jury to support that Chung was not the proximate cause of Marilyn's death. Thus, because plaintiff did not assert that any error occurred with respect to the issue of proximate causation, the evidence was sufficient to show that Chung was not the proximate cause of Marilyn's death, and we must presume the jury found in favor of Chung with respect to proximate causation, I find that the two-issue rule applies and would affirm the jury's verdict even if the court erred in its evidentiary rulings regarding the standard of care.

¶ 163       Finally, I note that, because I would conclude that the jury's finding that Chung was not the apparent agent of St. Alexius was not against the manifest weight of the evidence and because there was no reversible error with respect to the agency instructions, I would affirm the jury's finding with respect to St. Alexius on these bases alone, as the other evidentiary issues plaintiff raised only pertained to Chung. Thus, with respect to St. Alexius, I would affirm not only based on the two-issue rule but also because there was no reversible error with the agency issues plaintiff raised.

¶ 164                              Conclusion

¶ 165      For the reasons stated above, I respectfully dissent and would affirm the jury's verdict.

---

**No. 1-18-1887**

---

| | |
|---|---|
| **Cite as:** | *Perez v. St. Alexius Medical Center*, 2020 IL App (1st) 181887 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-L-10905; the Hon. Edward S. Harmening, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert S. Baizer, Joseph E. Kolar, and David A. Neiman, of Romanucci & Blandin, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Karen Kies DeGrand and Laura Coffey Ieremia, of Donohue Brown Mathewson & Smyth LLC, and Amy L. Anderson and Teresa R. Maher, of Brenner, Monroe, Scott & Anderson, Ltd., both of Chicago, for appellee Jeffrey E. Chung. |
| | Hugh C. Griffin, David C. Hall, and Matthew J. Ennis, of Hall Prangle & Schoonveld, LLC, of Chicago, for other appellee. |

---